## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| America's Gardening Resource, Inc., *et al.*, | Case No. 25-11180 (BLS) |
| Debtors.[1] | (Joint Administration Requested) |

**MOTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND
REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS
PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and, each, a "Debtor"), pursuant to sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), hereby move (this "Motion") the Court for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support of this Motion, the Debtors rely upon and hereby incorporate by reference the *Declaration of David M. Baker in Support of Chapter 11 Petitions and First Day Motions* (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: America's Gardening Resource, Inc. (9604); Gardener's Home LLC (0498); Serac Corporation (9800); IGH, Inc. (9336); Innovative Gardening Solutions, Inc. (3325). The location of the Debtors' corporate headquarters and the Debtors' service address in these chapter 11 cases is 128 Intervale Road, Burlington, Vermont 05401.

"First Day Declaration")[2], filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

## RELIEF REQUESTED

1.      The Debtors seek entry of an Interim Order and Final Order (i) authorizing the Debtors to: (a) pay all prepetition wages, salaries, other compensation, and Reimbursable Expenses on account of the Compensation and Benefits (each as defined herein) and (b) continue to administer the Compensation and Benefits, including payment of prepetition obligations related thereto in an aggregate amount not to exceed approximately $423,000.00 pursuant to the Interim Order; and (ii) granting related relief.

## JURISDICTION AND VENUE

2.      The United States District Court for the District of Delaware has jurisdiction to consider this Motion under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

50142135

4.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rules 2002-1 and 9013-1.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that the Chapter 11 Cases be jointly administered. The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in the First Day Declaration.

6.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to section 1107 and 1108 of the Bankruptcy Code.

7.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

## THE DEBTORS' WORKFORCE

### A.      The Debtors' Employees

8.      As of the Petition Date, the Debtors employ four hundred seventeen (415) individuals (collectively, the "Employees"). Currently, one hundred twenty-six (126) Employees are employed full-time, and two hundred ninety-one (289) Employees are employed part-time. The Debtors' Employees are categorized as follows, based on employment status: (1) Full-Time Regular Employees—i.e., Employees that work more than 36 hours per week and are employed on an annual basis; (2) Part-Time Regular Employees—i.e., Employees that work less than 36 (but

at least 24) hours per week and are employed on an annual basis (together with Full-Time Regular Employees, the "Regular Employees"); (3) Full-Time Temporary Employees—i.e., Employees that work 32 or more hours per week consecutively for nine months without a layoff; and, (4) Year-round Variable Employees—i.e., Employees that work variable hours averaging under 24 hours per week in a 12-month period. In addition, the Debtors employ Seasonal Employees, which are hired for a mutually agreed upon specified period of time.

9.     The Employees perform a variety of critical functions essential to ongoing operations including, among other things, retail sales, product fulfillment, product design/manufacturing, customer support, merchandising, and e-commerce operations, as well as administrative, accounting, and management-related tasks.   The skills and experience of the Employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing operations and ability to effectively operate during these Chapter 11 Cases.   Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted, and the administration of the Debtors' estates will be materially impaired.

10.     The Employees will be materially harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these Chapter 11 Cases.   Furthermore, the Debtors and their estates may be harmed if they are unable to provide compensation and benefits consistent with past practice.   Consequently, the relief requested herein is necessary and appropriate under the facts and circumstances of these Chapter 11 Cases.

## COMPENSATION AND BENEFITS

11.     To minimize the personal hardship that Employees would suffer if prepetition Employee-related obligations remain unpaid during these Chapter 11 Cases, the Debtors seek

4

50142135

authority to: (a) pay and honor certain prepetition claims relating to, among other things, Unpaid Compensation, Withholding Obligations, Unpaid Payroll Processing Fees, Reimbursable Expenses, Health and Welfare Coverage and Benefits, the Workers' Compensation Program, the 401(k) Plan and other retiree benefits, Paid Leave and Unpaid Leave, Identity Theft Insurance, and the Employee Stock Ownership Program (each as defined herein, and collectively, the "Compensation and Benefits"); and (b) pay all costs related to or on account of the Compensation and Benefits.

12.    Subject to the Court's approval, the Debtors intend to continue some or all of their prepetition Compensation and Benefits in the ordinary course of business.  Out of an abundance of caution, the Debtors request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the Debtors' sole discretion and in the ordinary course during these Chapter 11 Cases (subject in all respects to the terms of the Interim Order and Final Order, as applicable) and after notice and a hearing, subject to applicable law.

13.    Accordingly, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Compensation and Benefits:

14.    As of the Petition Date, the Debtors estimate that approximately $423,000.00 on account of Compensation and Benefits will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases.

**I.    Compensation, Withholding Obligations, Payroll Processing Fees, and Reimbursable Expenses.**

**A.  Unpaid Employee Compensation.**

15.    The Debtors incur obligations to their Employees for wages, overtime, and similar obligations (the "Employee Compensation").  Employees are typically paid every other Thursday,

5

with payroll funds generally withdrawn from the Debtors' bank accounts on the preceding Tuesday.  As a result of this schedule, certain Employees may be owed accrued but unpaid Employee Compensation as of the Petition Date (the "Unpaid Employee Compensation").  Unpaid Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

16.     The Debtors fund Employee Compensation through their payroll processor, Paycom ("Paycom"), who then electronically transfers the funds to Employees' bank accounts via direct deposit. Employees also have the option to receive a live check, depending on each Employee's preference.[3]   As of the Petition Date, the Debtors estimate that they owe approximately $260,000.00 on account of accrued but Unpaid Employee Compensation. Accordingly, the Debtors seek authority to pay any amounts related to Unpaid Employee Compensation in the ordinary course and consistent with past practice and to continue the Employee Compensation in the ordinary course during the administration of these Chapter 11 Cases.

### B.  Withholding Obligations.

17.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Payroll Taxes (each as defined below and collectively, the "Withholding Obligations").  As of the Petition Date, the Debtors estimate that they owe approximately $95,000.00 of Withholding Obligations, including the Debtors' payroll tax payments.

---

[3]     Currently, there are only two employees who receive physical checks. The rest of the Debtors' Employees receive payments by direct deposit.

50142135

Accordingly, the Debtors seek authority to continue to honor their Withholding Obligations and to pay any prepetition claims with respect thereto in the ordinary course of business and consistent with past practice.

### i.   Payroll Deductions.

18.   During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including legally ordered deductions and garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, and miscellaneous deductions (collectively, the "Payroll Deductions"), and forward the Payroll Deductions to various third-party recipients.  The Debtors retain only those Payroll Deductions related to the Employees' share of health care benefits and insurance premiums.  As of the Petition Date, the Debtors estimate that they owe approximately $20,000.00 on account of the Payroll Deductions, all of which will come due and owing within the first twenty-one days (21) of these Chapter 11 Cases.  Accordingly, the Debtors seek authority to pay any unpaid Payroll Deductions in a manner consistent with past practice and to continue to honor the Payroll Deductions in the ordinary course during these Chapter 11 Cases.

### ii.   Payroll Taxes.

19.   In addition to the Payroll Deductions, certain federal and state laws require that the Debtors withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (the "Employee Payroll Taxes").  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll,

7

additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities, through Paycom, in accordance with remittance intervals and deadlines established by those taxing authorities. As of the Petition Date, the Debtors estimate that they owe approximately $75,000.00 on account of the Payroll Taxes. Accordingly, the Debtors seek authority to pay, or cause to be paid, any unpaid Payroll Taxes in a manner consistent with past practice and to continue to honor the Payroll Taxes in the ordinary course of business during these Chapter 11 Cases.

### C. Payroll Processing Fees.

20.     Paycom processes and administers certain Withholding Obligations through Paycom for the Employees. Paycom's service fees are typically deducted from the Debtors' bank accounts on the same Tuesday that payroll funds are withdrawn, two days prior to each biweekly Thursday pay date. As of the Petition Date, the Debtors estimate they owe approximately $3,000.00 on account of prepetition payroll processing services (the "Unpaid Payroll Processing Fees"), all of which will come due within the first twenty-one days of these Chapter 11 Cases. Accordingly, the Debtors seek authority to pay the Unpaid Payroll Processing Fees in the ordinary course and consistent with past practice and to continue payroll processing during the administration of these Chapter 11 Cases.

### D. Reimbursable Expenses.

21.     In the ordinary course of business, the Debtors reimburse certain Employees for pre-approved expenses incurred on behalf of the Debtors within the scope of their employment (the "Reimbursable Expenses"). Certain of the Reimbursable Expenses are incurred through the use of corporate credit cards (the "Corporate Credit Cards") serviced by FNBO (the "Credit Card Servicer"). The Debtors have issued Corporate Credit Cards to 19 Employees to fund reasonable

business expenses, including, among other expenses, travel-related expenses, marketing and promotional costs, and incidental operational expenditures.[4]  The Corporate Credit Cards serviced through the Credit Card Servicer have credit limits ranging from $2,000 to $40,000, with limits determined based on such Employee's job responsibility. Charges made with Corporate Credit Cards generally flow through an internal approval process, beginning with review by the Employee's supervisor and then routed to the Debtors' accounting team for processing. The Debtors remit payment to the Credit Card Servicer on account of obligations incurred through the Corporate Credit Cards on a monthly basis.

22.     In addition to Reimbursable Expenses incurred through the use of Corporate Credit Cards, the Debtors also directly or indirectly reimburse Employees for certain additional eligible expenses incurred in connection with their employment. For instance, the Debtors reimburse Employees for business travel and meals, product samples, footwear for distribution center staff, and internet for certain IT personnel.

23.     The Debtors' inability to reimburse the Reimbursable Expenses could impose a hardship on the Employees where such individuals incurred obligations for the Debtors' benefit. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.  Although the Debtors ask that reimbursement requests be promptly submitted, some requests for reimbursement timely made prior to the Petition Date may not yet have been processed in the ordinary course of business, and some delays in submission may result in Employees submitting reimbursement requests for prepetition expenses after the Petition Date.

---

[4]     In addition to the credit cards described above, the Debtors also maintain a corporate credit card through Bank of America that is used exclusively for marketing-related expenses. This card is not tied to any particular employee and is not used for payroll or employee reimbursement purposes.

50142135

24.     As of the Petition Date, the Debtors estimate that they owe approximately $10,000 in aggregate Reimbursable Expenses, all of which will come due within the first twenty-one (21) days of these Chapter 11 Cases.  Accordingly, to avoid harming Employees who have incurred Reimbursable Expenses on behalf of the Debtors and who may be or become personally liable for such expenses, the Debtors seek authority to pay the Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course of business and consistent with past practice during these Chapter 11 Cases.

## II.     Employee Benefits Programs.

25.     The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, vision, and dental insurance plans, supplemental life insurance, accidental death and dismemberment insurance, disability benefits, workers' compensation, COBRA benefits, 401(k) plan and retirement plans, employee assistance program, employee stock ownership plan ("ESOP"), and other employee benefit plans (collectively, the "Employee Benefits Programs").

26.     As of the Petition Date, the Debtors estimate that they owe approximately $135,000.00 in aggregate amount on account of the Employee Benefits Programs, all of which will become due and owing within the first twenty-one (21) days of these Chapter 11 Cases. Accordingly, the Debtors seek authority to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs; and (b) continue to provide Employee Benefits Programs in the ordinary course and consistent with past practice during the administration of these Chapter 11 Cases.  Each of the Employee Benefits Programs are described in greater detail below.

### A.  Health and Welfare Coverage and Benefits.

27.     The Debtors offer their Employees the ability to participate in a number of health insurance and benefits programs, including, among other programs, medical, dental, employee

10

assistance program and vision coverage plans, and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits").  The Health and Welfare Coverage and Benefits are, in each case, available to Full-Time Regular and Part-Time Regular Employees (the "Eligible Employees").

28.     The Debtors' Health and Welfare Coverage and Benefits include Medical and Prescription Coverage, Dental Insurance Coverage, Vision Insurance Coverage, FSA Program participation, and Other Coverage and Benefits (each defined below). Employees contribute to the cost of the Health and Welfare Coverage and Benefits through payroll deductions each pay period.

29.     The Debtors provide Eligible Employees with one option for medical and prescription coverage—a Health Savings Account Open Access Plus Plan (the "Medical and Prescription Coverage")—which is provided through Cigna Healthcare ("Cigna"). Eligible Employees have the option to waive coverage if they are covered under another insurance plan. The Debtors contribute $500 annually to the Health Savings Account of each Eligible Employee enrolled in Medical and Prescription Coverage. Approximately 78% of Employees enroll in Medical and Prescription Coverage.

30.     The Debtors also offer Eligible Employees a PPO dental insurance plan ("Dental Insurance Coverage") administered by Northeast Delta Dental ("Delta"). Approximately 83% of Employees enroll in Dental Insurance Coverage.

31.     The Medical and Prescription Coverage and Dental Insurance Coverage are funded by premiums paid by the Debtors and Employees. The Debtors pay 91% of the Medical and Prescription Coverage and Dental Insurance Coverage premiums for Eligible Employees who work 36 or more hours per week and elect employee-only coverage; the Eligible Employees pay the remaining 9%. For Eligible Employees who are regularly scheduled to work 36 hours per week

50142135

or fewer but commit to and work at least 24 hours per week, the Debtors pay a prorated portion of employee-only Medical and Prescription Coverage and Dental Insurance Coverage premiums—approximately 91%; the Eligible Employees pay the remaining 9%. Employees cover the remaining amounts through premiums that are deducted from their paychecks. For Eligible Employees who elect to cover eligible dependents, including family members, legal spouses, etc., the Debtors subsidize the cost of Medical and Prescription Coverage and Dental Insurance Coverage premiums for dependent coverage. Employees cover the remaining amount for eligible dependents through premiums that are deducted from their paychecks.

32.     Premiums for Medical and Prescription Coverage and Dental Insurance Coverage are deducted from Eligible Employees' paychecks before calculating payroll and income taxes.

33.     The Debtors also offer a voluntary vision insurance plan provided by VSP Vision Care ("Vision Insurance Coverage").  The Company covers 0% of the premium cost for Vision Insurance Coverage for Eligible Employees, eligible dependents, including legal spouses, domestic partners, and children Approximately 55% of Employees enroll in Vision Insurance Coverage.

34.     The Debtors also offer Eligible Employees the opportunity to participate in a Flexible Spending Account program administered by Ameriflex, which includes options for both healthcare and dependent care expenses (the "FSA Program"). Employees elect contribution amounts, which are withheld from their paychecks and remitted to Ameriflex. The Debtors do not contribute to the FSA Program. Approximately 33% of Eligible Employees participate in the FSA Program. The Debtors seek authority to continue administering the FSA Program and to remit any withheld amounts to Ameriflex in the ordinary course of business.

12

35.     Other voluntary, Debtor-provided and Employee-paid benefits include access to various health and wellness programs provided by third-party vendors (the "Other Coverage and Benefits").

36.     As described above, failing to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce.  Indeed, Employees may submit prepetition claims for processing after the Petition Date.  Accordingly, the Debtors seek authority to continue to honor their Health and Welfare Coverage and Benefits and to pay any prepetition claims with respect thereto in the ordinary course of business and consistent with past practice.

**B. COBRA.**

37.     The Debtors' Medical and Prescription Coverage also provides former Employees with certain health benefits following their departure from the Debtors.  More specifically, pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), former Employees of the Debtors (the "COBRA Employees") may continue to receive Medical and Prescription Coverage, Dental Insurance Coverage, and Vision Insurance Coverage (the "COBRA Benefits").  COBRA Employees are entitled by law to continue to receive COBRA Benefits for up to eighteen (18) months, and in some instances up to thirty-six (36) months, following termination of employment.

38.     COBRA Employees are responsible for paying all costs associated with the COBRA Benefits, plus 2% for administrative costs.  The Debtors provide COBRA benefits as part of their usual expenditure on account of the Medical and Prescription Coverage. At present, there is one former employee who is who is receiving COBRA benefits for vision and dental coverage. Accordingly, the Debtors seek authority to (a) pay any prepetition amounts outstanding on account of the COBRA Benefits solely out of an abundance of caution, (b) continue to offer the COBRA

13

Benefits, including to those Employees who may be terminated after the Petition Date, and honor all obligations related thereto on a postpetition basis in the ordinary course of business and consistent with past practices, and (c) continue to pay fees related to the COBRA Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

### C.   Other Insurance, Long-Term Disability, and Employee Assistance Programs.

#### i.   Group Life, Short Term and Long-Term Disability, and AD&D Insurance Coverage.

39.     The Debtors provide various group life insurance ("Group Life Insurance"), short-term disability insurance ("Short-Term Disability Insurance" and long-term disability insurance ("Long-Term Disability Insurance"), and accidental death and dismemberment ("AD&D Insurance" and, together with Group Life Insurance, Short-Term Disability Insurance, and Long-Term Disability Insurance, "Life, Disability, and AD&D Insurance Coverage") to Full and eligible Part-Time Regular Employees, administered by Reliance Standard.  The fees for administering the Life, Disability, and AD&D Insurance Coverage are incorporated into the monthly premiums.

40.     Eligible Employees must affirmatively opt in to receive Short-Term Disability Insurance and must pay the full premiums for this policy.

41.     The Debtors pay the full premium for Long-Term Disability Insurance.

42.     Eligible Employees are automatically enrolled in the Debtors' Group Life Insurance plan. The Debtors pay the full premium for eligible Employees.

43.     AD&D Insurance is a voluntary benefit which Employees may sign up for upon hire or during open enrollment

44.     24% percent of Employees are enrolled in Group Life Insurance. 80% of Employees are enrolled in Short-Term Disability Insurance. 100% of Employees are enrolled in Long-Term Disability Insurance. 21% of Employees are enrolled in AD&D Insurance Coverage.

50142135

45.     The Debtors believe they owe approximately $11,000.00 in prepetition amounts on account of the Life, Disability, and AD&D Insurance Coverage for the current month premium. Accordingly, the Debtors seek authority to (a) pay any prepetition amounts outstanding on account of the Life, Disability, and AD&D Insurance Coverage, and (b) continue to offer the Life, Disability, and AD&D Insurance Coverage and honor all obligations related thereto on a postpetition basis in the ordinary course of business and consistent with past practice.

### ii.    Identity Theft Insurance.

40.     The Debtors maintain voluntary identity theft protection insurance ("Identity Theft Protection Insurance Coverage") through Gen Digital (Norton Lifelock), which Employees may sign up for upon hire or during open enrollment.

41.     Approximately 17% percent of Employees are enrolled in Identity Theft Protection Insurance Coverage.  The Debtors believe they owe approximately $212.00 in prepetition amounts on account of the Identity Theft Protection Insurance Coverage for the current month premium.

### iii.    Workers' Compensation.

42.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program").  As part of the Workers' Compensation Program, the Debtors maintain a workers' compensation insurance policy with Arch Insurance Company.

43.     The Debtors must continue claim assessment, determination, adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with

15

applicable workers' compensation laws and requirements.[5]  As of the Petition Date, there are 8 pending claims under the Workers' Compensation Program.  The Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with such claims and any further claims that may be filed under the Workers' Compensation Program.

44.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the Chapter 11 Cases.  As of the Petition Date, the Debtors do not believe that any amounts are owed on account of accrued but unpaid Workers' Compensation Program obligations (the "Workers' Compensation Program Obligations").  Out of an abundance of caution, the Debtors request authority to (a) pay prepetition amounts due on account of the Workers' Compensation Program Obligations in the ordinary course of business and consistent with past practice, if any, (b) continue the Workers' Compensation Program in the ordinary course of business, and (c) the extent applicable, modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

### iv.     Employee Assistance Program.

45.     The Debtors maintain an emergency assistance program (the "Employee Assistance Program").  The Employee Assistance Program provides all Employees and immediate family members counseling services.  As of the Petition Date, the Debtors owe $0 on account of the Employee Assistance Program.

---

[5]     The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  Accordingly, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any necessary modifications thereto.

50142135

### D. The 401(k) Plan.

46.     The Debtors maintain a retirement savings plan for the benefit of certain Employees—specifically, full-time regular Employees and part-time regular Employees who commit to and work at least 24 hours per week—that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). These Employees become eligible for participation in the 401(k) plan on the day of each plan quarter, coincident with or next following the date on which the Employee completes 30 days of service.[6]  The 401(k) Plan is administered by America's Gardening Resource, Inc. with support from Plan Integrity Partners, LLC, John Hancock, and Pensionmark Financial Group, and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code and/or Roth contributions.  Each pay period, the Debtors deduct their Employees' 401(k) Plan contributions from the applicable Employees' paychecks (the "401(k) Deductions") and hold such amounts in trust until they are remitted to John Hancock.  As of the Petition Date, the Debtors estimate that they owe approximately $12,000.00 on account of the 401(k) Deductions (the "Unremitted 401(k) Deductions") and seek authority to remit Unremitted 401(k) Deductions if any become due. The Debtors do not match Employee contributions to the 401(k) Plan.[7]

47.     Some Employees' retirement savings may consist principally or solely of the 401(k) Plan.  Thus, the Debtors believe that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employee expectations.  In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

---

[6]     If the Employee does not meet the requirement as specified, they will also be eligible for the Plan if they complete 1,000 hours of service in a consecutive 12-month period beginning with the Employee's first day of employment.

[7]     This amount is previously accounted for in the Withholding Obligations section, *supra*.

48. Accordingly, the Debtors seek authority to (a) continue the 401(k) Plan in the ordinary course of business on a postpetition basis and (b) remit all Unremitted 401(k) Deductions collected in the ordinary course of business and to pay any prepetition claims with respect thereto.

### E. Paid and Unpaid Leave.

49. The Debtors provide paid time off to their various categories Employees—including Full-Time Regular Employees, Part-Time Regular Employees, Year-round variable Employees, and Full-Time Temporary Employees, which is classified as "Vacation" and "Sick Leave." Earned Vacation varies based on the classification of Employee and time spent working for the Debtors and increases with years of employment.

50. In general, Regular Employees with less than one year of time with the Debtors may earn vacation on a prorated basis up to 15 working days of Vacation. After one year, Regular Employees will earn three weeks of Vacation (15 working days). After two years, Regular Employees will earn four weeks of Vacation (20 working days). After five years, Employees will earn four weeks of Vacation (20 working days), plus one additional day for each year, up to a maximum of five weeks (25 working days).

51. Vacation accrues for Full-Time Regular Employees on the following schedule:

| Years of Service | Total Hours Earned in FY | Hours Earned Per Pay Period | Carry-Over |
|---|---|---|---|
| 1-2 Years | 120 | 4.62 | 80 |
| 3-5 Years | 160 | 6.15 | 80 |
| 6 Years | 168 | 6.46 | 80 |
| 7 Years | 176 | 6.77 | 80 |
| 8 Years | 184 | 7.08 | 80 |
| 9 Years | 192 | 7.38 | 80 |
| 10+ Years | 200 | 7.69 | 80 |

52. Vacation accrues for Part-Time Regular Employees who work between 30 and 35 hours per week on the following schedule:

| Years of Service | Total Hours Earned in FY | Hours Earned Per Pay Period | Carry-Over |
|---|---|---|---|
| 1-2 Years | 96 | 3.69 | 64 |
| 3-5 Years | 128 | 4.92 | 64 |
| 6 Years | 134 | 5.15 | 64 |
| 7 Years | 141 | 5.42 | 64 |
| 8 Years | 147 | 5.65 | 64 |
| 9 Years | 154 | 5.92 | 64 |
| 10+ Years | 160 | 6.15 | 64 |

53.     Vacation accrues for Part-Time Regular Employees who work between 24 and 29 hours per week on the following schedule:

| Years of Service | Total Hours Earned in FY | Hours Earned Per Pay Period | Carry-Over |
|---|---|---|---|
| 1-2 Years | 75 | 2.88 | 50.4 |
| 3-5 Years | 100 | 3.85 | 50.4 |
| 6 Years | 105 | 4.04 | 50.4 |
| 7 Years | 110 | 4.23 | 50.4 |
| 8 Years | 115 | 4.42 | 50.4 |
| 9 Years | 120 | 4.62 | 50.4 |
| 10+ Years | 125 | 4.81 | 50.4 |

54.     Vacation accrues for Year-round Variable Employees on the following schedule:

| Years of Service | Accrual Rate Per Hour Worked | Carry-Over |
|---|---|---|
| 1-2 Years | 0.0577 | 80 |
| 3-5 Years | 0.0769 | 80 |
| 6 Years | 0.0808 | 80 |
| 7 Years | 0.0846 | 80 |
| 8 Years | 0.0885 | 80 |
| 9 Years | 0.0923 | 80 |
| 10+ Years | 0.0962 | 80 |

55.     Full-Time Temporary Employees accrue Vacation based on hours worked. The accrual rate for this category of Employees is 0.058 per hour worked and will not increase with years of employment.

56.     Seasonal Employees do not earn Vacation.

19

57.    Vacation accruals are awarded on pay day. Approval of Vacation is at the discretion of management. Unused Vacation may be carried over to the next fiscal year, but no more than the amounts specified on the accrual tables.

58.    Sick Leave is earned based on the classification of Employee. Full-Time Regular Employee are eligible for up to five sick days per year. Part-Time Regular Employees, who commit to and work at least 24 hours per week, are eligible for sick days as well, prorated according to time worked. Sick Leave is Earned based on the following Schedules:

| Full-Time & Part-Time Regular Employees | | |
|---|---|---|
| **Committed Hours** | **Total Hours Earned Per Year** | **Hours Earned Per Pay Period** |
| 36-40 | 40 Hours | 1.54 |
| 30-35 | 32 Hours | 1.23 |
| 24-29 | 25 Hours | 0.96 |

| Seasonal Employees | | |
|---|---|---|
| **Committed Hours** | **Accrual Rate Per Hour** | **Capped Hours Per Year** |
| Seasonal VT, NH | .0192 | 40 |
| Seasonal MA | 0.033 | 40 |

59.    Unused Sick Leave may be carried forward to the next year up to a maximum of 20 days (160 Hours) for Full-Time and Part-Time Regular Employees.

60.    The Debtors do not believe that they owe any Vacation payouts to any former Employees as of the Petition Date, but seek to continue their policy postpetition in the ordinary course of business.

61.    The Debtors also maintain a holiday leave policy ("Holiday Leave"), whereby Employees are eligible for paid holidays on the following basis:

    a)  Full-Time Regular Employees – 6 days;

    b)  Part-Time Regular Employees – 6 days, prorated, who commit to and work 24 hours per week; and

    c)  Full-Time Temporary Employees – 6 days.

20

62.     Regular hourly Employees are provided with one floating holiday to be used in a specified period as determined by the Employee's supervisor and Human Resources.

63.     Seasonal, Repeat Seasonal, and Year-Round Variable hourly Employees are not eligible for company observed holidays; however, they will receive time and one-half for holiday hours worked.

64.     In addition to the paid leave policies described above, the Debtors provide certain other forms of paid time off, to other paid leaves of absence for personal reasons, many of which are required by law, including, but not limited to, paid family and parental leave for Full and Part-Time Regular Employees, sabbaticals, time missed for bereavement, and jury or court attendance, ("Other Paid Leave," and collectively with Vacation Leave, Sick Leave, and Holiday Leave, "Paid Leave").   Holiday Leave and Other Paid Leave do not represent any current cash payment obligations.

65.     Additionally, the Debtors provide unpaid leaves of absence for additional sick leave, military leave, leave under the Family and Medical Leave Act, and other similar purposes (collectively, the "Unpaid Leave").

66.     Continuing the Paid Leave and Unpaid Leave policies consistent with prior practice is essential to maintaining Employee morale during these Chapter 11 Cases.   Furthermore, the policies are broad-based programs upon which all Employees have come to depend.   The Paid Leave and Unpaid Leave do not typically involve incremental cash outlays beyond standard payroll obligations, but out of an abundance of caution, the Debtors seek authority to continue the Paid Leave and Unpaid Leave policies in the ordinary course of business on a postpetition basis and pay prepetition claims, if any, with respect thereto.

**F. Annual Cash Profit Sharing Program.**

67.     The Debtors have historically maintained an annual cash profit-sharing program for certain employee, including Full-Time Regular, Part-Time Regular, Year-Round Variable, and Seasonal Employees (the "Annual Cash Profit Sharing Program").

68.     The Annual Cash Profit Sharing Program is revised annually based on the Debtors' financial performance and business needs. Under the terms of the program, Full and Part-Time Regular Employees generally must be employed at the time of payout to be eligible to receive a profit-sharing award, while Seasonal Employees are only eligible if they return the following year, with any award paid upon their return.

69.     As of the Petition Date, the Debtors estimate that no amounts are owed on account of the Annual Cash Profit Sharing program. The Debtors are not seeking authority to continue, fund, or make payments under the Annual Cash Profit Sharing Program at this time.

**G. Employee Stock Ownership Plan.**

70.     The Debtors maintain an ESOP, which was established in 1986 and, as of 2009, holds 100% of the Debtors' issued and outstanding equity interests. The ESOP is administered by Plan Integrity Partners. The eligibility of participants is determined by the following conditions: (1) the employee must be age 18 or older, and (2) the employee must have completed 1,000 hours of work with the Debtors during the first year following the first day of employment.

71.     The ESOP does not permit or require Employee contributions. The Debtors make contributions and their sole discretion, which are then allocated to employee accounts.

72.     In order to receive ESOP benefits, participating employees must be vested. Vesting occurs in accordance with the following formula:

| Years of Service | Percentage Vested |
|---|---|
| Less than 1 | 0% |
| 1, but less than 2 | 0% |

| 2, but less than 3 | 20% |
|---|---|
| 3, but less than 4 | 40% |
| 4, but less than 5 | 60% |
| 5, but less than 6 | 80% |
| 6, but less than 7 | 100% |

73.     ESOP benefits are payable according to the vesting schedule when an Employee's employment with the Debtors, ends or if they retire. In the event of disability or death, ESOP benefits are payable and are automatically 100% vested.

74.     As of the Petition Date, the Debtors are not seeking to continue to fund or make payments under the ESOP.

**H. Severance Program.**

75.     The Debtors do not maintain a severance policy in the ordinary course of business, although the Debtors' Chief Executive Officer, Rebecca Gray, has an employment agreement with a severance package. By this Motion, the Debtors neither are seeking to pay any severance obligations, nor do they believe that any severance obligations currently are due and owing. The Debtors, however, reserve all rights to seek authority to pay any applicable severance obligations pursuant to a chapter 11 plan or a separate motion, or to contest any assertion that severance obligations may be due and owing.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

I.     **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations.**

A.     **Certain of the Compensation and Benefits are Entitled to Priority Treatment.**

76.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims given priority under sections 507(a)(4) and 507(a)(5)

of the Bankruptcy Code for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).

77.     The Debtors' Employees are essential to the success of these Chapter 11 Cases and the Debtors' business.  As such, payment of the Compensation and Benefits at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new qualified talent would be extremely difficult. Losing the Debtors' significant talent base would create additional challenges to the Debtors' restructuring efforts.  As such, it is necessary pay any accrued but unpaid Compensation and Benefits.

### B.      Paying Certain Compensation and Benefits Is Required by Law

78.     As discussed above, the Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages.  Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Furthermore, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors

request authority to transmit the Withholding Obligations to the proper parties in the ordinary course of business.  *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998).

79.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the success of these Chapter 11 Cases.

80.     The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business and consistent with past practice.

## II.     Paying Compensation and Benefits Is Warranted Under Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity

81.     Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Compensation and Benefits as such actions are in the ordinary course of the Debtors' business. Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any destruction to the value of their estates.

82.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the value of the estate.  *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824–26 (D. Del. 1999); *see also In re Windstream Holdings Inc.*, 614 B.R. 441 (S.D.N.Y. 2020), *appeal dismissed as moot sub nom.*, 838 F. App'x 634 (2d Cir. 2021), *cert. denied sub nom.*, 142 S. Ct. 226, 211 L. Ed. 2d 99 (2021); *In re CoServ, L.L.C.*, 273 B.R.

487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr.

S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips,*

*Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal

theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of

prepetition claims.

83.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale

or lease of property of the estate under this section, courts require the debtor to show that a sound

business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward*

*Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)

(collecting cases); *see also Windstream Holdings*, 614 B.R. at 457, 460 (affirming order to pay

critical vendor prepetition claims in reliance of section 363 to benefit the Debtors' estates for all

creditors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to

justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr.

D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction

under section 363(b) of the Bankruptcy Code).

84.     Courts also authorize payment of prepetition claims in appropriate circumstances

based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent

equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code,

courts may authorize pre-plan payments of prepetition obligations when essential to the continued

operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825−26.  Specifically, a court may

26

use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g., Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay pre-petition claims that are essential to the continued operation of the business.). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

85.     These standards are satisfied here. Paying the Compensation and Benefits in the ordinary course represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code. Paying the Compensation and Benefits in the ordinary course will maximize the value of the Debtors' estates for the benefit of their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, certain critical Employees may seek alternative employment opportunities. Such a development would diminish the value of the Debtors' estates at this critical juncture. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be, at a minimum, distracting at this crucial time

and may well result in the Debtors' immediate cessation of operations.  Accordingly, the Debtors must pay Compensation and Benefits in the ordinary course and consistent with past practice.

86.      In addition, many Employees rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay Compensation and Benefits in the ordinary course.  Moreover, failure to timely satisfy such obligations will jeopardize workforce morale and loyalty at this crucial time.  Furthermore, if this Court does not grant the relief requested herein, Employees will not receive health coverage and may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety for Employees at a time when the Debtors need all Employees to perform their best.  Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, to the extent the Debtors' would be able to do so, severely disrupting the Debtors' operations at this critical juncture.

87.      The importance of a debtor's workforce to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g., In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Jul. 9, 2024); *In re Appgee, Inc.*, Case No. 24-10956 (CTG) (Bankr. D. Del. May 28, 2024); *In re View, Inc.*, 24-10692 (CTG) (Bankr. D. Del Apr. 23, 2024).

### III.      A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here

88.      Section 362(a) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

50142135

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id*. § 362(d)(1).

89.     Pursuant to section 362(d) of the Bankruptcy Code, the Debtors seek to modify the automatic stay to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  Cause exists here to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial wellbeing and morale of certain Employees and lead to the departure of Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' business, which would be to the detriment of all parties in interest.

## IV.     Processing of Checks and Electronic Fund Transfers Should be Authorized

90.     The Debtors forecast that they will have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of access to cash on hand, as well as consensual use of cash collateral and proceeds of a debtor-in-possession facility subject to other orders of this Court.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(b) ARE SATISFIED

91.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid

50142135

immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical and the failure to receive the relief requested herein relief during the first twenty-one days of these Chapter 11 Cases could adversely impact the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate this business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## RESERVATION OF RIGHTS

92.     Nothing contained in this motion or any order granting the relief requested in this Motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors

30

or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

93.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

94.     The Debtors will provide notice of this motion to:  (a) the United States Trustee for the District of Delaware; (b) counsel to the Debtors' prepetition lenders; (c) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (d) the United States Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) the Delaware State Treasury; (h) the Delaware Secretary of State; (i) the office of the attorney general of each of the states in which the Debtors operate; and (j) all parties that have requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that no other or further notice is required under the circumstances.

## NO PRIOR REQUEST

95.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors request entry of the Interim Order and the Final Order, each substantially in the forms attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 20, 2025
      Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Patrick J. Reilley*
Patrick J. Reilley (No. 4451)
Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 600
Wilmington, Delaware 19801
Telephone:(302) 652-3131
Facsimile: (302) 574-2103
Email:    preilley@coleschotz.com
        jdougherty@coleschotz.com

-and-

Gary H. Leibowitz (*pro hac vice* admission pending)
H.C. Jones III (*pro hac vice* admission pending)
J. Michael Pardoe (*pro hac vice* admission pending)
1201 Wills Street, Suite 320
Baltimore, Maryland 21231
Telephone: (410) 230-0660
Facsimile: (410) 230-0667
Email:    gleibowitz@coleschotz.com
        hjones@coleschotz.com
        mpardoe@coleschotz.com

*Proposed Counsel for Debtors and Debtors-in-Possession*