# EXHIBIT 1

### FIRST AMENDMENT TO LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** (the "First Amendment") is made this _11_ day of December, 2012, by and between **THE MILLER REALTY GROUP, LLP** (the "Landlord") and **AMERICA'S GARDENING RESOURCE, INC.** (the "Tenant").

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant have heretofore entered into a Lease Agreement (the "Lease") dated December 9, 2011 of certain premises consisting of 129,724 square feet of distribution and office space in a building located on Lots 1 and 2 in Catamount Industrial Park in Milton, Vermont; and

**WHEREAS**, Landlord and Tenant have agreed to amend the Lease.

**NOW, THEREFORE,** in consideration of the mutual covenants and provisions contained herein, the Lease is hereby amended as follows:

I.   By deleting the first sentence of Section 3(b) of the Lease in its entirety and replacing it with the following: "The Base Rent set forth in Section 3(a)(1) above shall be increased as of the two year anniversary of the Rent Commencement Date (the two-year anniversary being September 1, 2014), and annually thereafter during the term hereof by an amount equal to the percentage increase in the CPI-U as defined herein over the Base Rent for the preceding twelve-month period, but in no event shall such increase exceed four percent (4%) of the Base Rent for the preceding twelve-month period.

II.  In all other respects, the Lease as hereby amended and modified, is hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the Parties hereto have executed this First Amendment to Lease Agreement, as of the date first above-written.

IN PRESENCE OF:                    THE MILLER REALTY GROUP, LLP

_Laurie M. Bashaw_                 _[signature]_
Witness                            Duly Authorized Agent

IN PRESENCE OF:                    AMERICA'S GARDENING RESOURCE, INC.

_Ellen Desjarden_                  _[signature]_
Witness                            Duly Authorized Agent

1

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

At _Williston_ in said County and State, this _11th_ day of December, 2012, personally appeared Robert E. Miller, duly authorized agent of THE MILLER REALTY GROUP, LLP and he acknowledged this instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of THE MILLER REALTY GROUP, LLP.

Before me, _Louise M. Bashaw_
Notary Public
My commission expires:  02/10/15

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

At _Burlington_, in said County and State, this _11th_ day of December 2012, personally appeared _Cindy Turcot_, duly authorized agent of AMERICA'S GARDENING RESOURCE, INC. and he/she acknowledged this instrument, by him/her sealed and subscribed, to be his/her free act and deed and the free act and deed of AMERICA'S GARDENING RESOURCE, INC.

Before me, _Ellen Desjardin_
Notary Public
My commission expires:  02/10/15

## LEASE AGREEMENT

AGREEMENT OF LEASE, made as of this _9ᵗ_ day of December, 2011, by and between THE MILLER REALTY GROUP, LLP, a Vermont limited liability partnership with its principal place of business at 599 Avenue D in Williston, County of Chittenden and State of Vermont ("Landlord") and AMERICA'S GARDENING RESOURCE, INC., a Delaware corporation with a place of business at 128 Intervale Road in Burlington, County of Chittenden and State of Vermont ("Tenant"), (hereinafter the Landlord and Tenant are sometimes collectively called the "Parties").

## EXPLANATORY STATEMENT

**WHEREAS,** Landlord and Tenant entered into a lease agreement on September 27, 2005 (the "Essex Lease") whereby Landlord leased to Tenant approximately One Hundred Forty Thousand Square Feet in a building owned by Landlord with an address of 5 New England Drive in Essex, Vermont; and

**WHEREAS,** pursuant to the terms of the Lease, as amended, the initial term was to expire on September 30, 2010, and Tenant had an option to renew for two (2) additional terms of five (5) years each; and

**WHEREAS,** Landlord and Tenant have agreed that Tenant's business would benefit from a new building in which to operate its business; and

**WHEREAS,** Landlord has agreed to construct a new one-story building comprising approximately 129,724 square feet of distribution and office space located at Catamount Industrial Park in Milton, Vermont; and

**WHEREAS,** Landlord has agreed to reimburse Tenant with a portion of its moving and relocation costs as set forth in this Lease; and

**WHEREAS,** Tenant has agreed to be bound under the terms hereof as of the date of this Lease (the "Commencement Date") and continue paying rent and other amounts payable to Landlord under the Essex Lease until the Rent Commencement Date; and

**WHEREAS,** it is the intention of Landlord and Tenant to terminate the Essex Lease as of the Rent Commencement Date.

**NOW, THEREFORE,** in consideration of the explanatory statement above, the mutual covenants and promises made by one to the other, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## WITNESSETH:

1

## SECTION 1. Demise, Description of Premises.

The Landlord hereby leases to the Tenant 129,724 square feet of distribution and office space in a one- story building (the "Building") located at Catamount Industrial Park in Milton, Vermont , on a parcel of land owned by Landlord more particularly described in Exhibit A attached hereto and made a part hereof (hereinafter referred to as the "Premises").   The Premises include the right of Tenant, its agents, invitees, licensees, business visitors, and guests, in common with others: (i) to cross and re-cross the driveways, parking lots, gravel drives and gravel fire lanes for the purposes of ingress and egress to and from the Premises, as depicted on the plan entitled "Overall Site Plan, The Miller Realty Group, LLP, Lots 1 & 2, Catamount Industrial Park, Gonyeau Road & U.S. Route 7, Milton, Vermont" dated June 20, 2011, last revised September 1, 2011, prepared by Lamoureux and Dickinson Consulting Engineers, Inc., and recorded in Map Slide D444, Page B of the Town of Milton Land Records (the "Site Plan"), a copy of which is attached hereto as Exhibit B; and (ii) to use the garden plots and all of the parking spaces depicted on the Site Plan without additional charge from Landlord, subject to the requirements of all applicable laws, ordinances, permits and approvals.  The Premises shall additionally include any addition to the building on the property within the area identified as "Potential Future Expansion" on the Site Plan, if and when constructed, in accordance with Section 18 below.

Landlord represents and warrants that it has good and marketable title to the Premises and underlying land and that the Premises are subject to the covenants, restrictions, and easements as set forth in Exhibit C attached hereto, none of which unreasonably or materially limit the use of the Premises for Tenant's intended and permitted use as set forth in this Lease.

## SECTION 2. Initial Term of Lease.

Said Premises will be leased to Tenant, subject to all of the terms and conditions contained herein, for an initial term of ten (10) years from the Rent Commencement Date unless said term be sooner terminated as hereinafter provided (the "Initial Term").  Landlord and Tenant agree that they will be bound under the terms and conditions contained herein as of the date hereof.   From the date hereof to the Rent Commencement Date, Tenant shall pay rent and additional amounts due to Landlord under the Essex Lease, incorporated herein by reference.  Landlord and Tenant further agree that upon the Rent Commencement Date, the Essex Lease shall be terminated and of no more effect, and they will thereof and thereafter, as provided herein, be bound under the terms and conditions contained in this Lease. The Rent Commencement Date shall be later of September 1, 2012 or One Hundred Twenty (120) days from the date that "Landlord's Work" is substantially complete.  For purposes of this Lease, the term "substantially complete" shall mean: (a) the construction of the Premises and the related site work (the "Project") is sufficiently complete to allow Tenant to begin the installation of its fit-up which Tenant desires to install in the Premises; (b) Landlord delivers possession of the Premises to Tenant; and (c) a Certificate of Occupancy has been issued by the Town of Milton and by the Vermont Department of Public Safety to allow Tenant to occupy the space; provided, however that if a permanent certificate of occupancy is not obtainable from either the Town of Milton or

2

the Vermont Department of Labor and Industry until Tenant completes its work, the requirement of a certificate of occupancy will be deemed satisfied by delivery to Tenant of a "temporary" certificate of occupancy or the equivalent either in verbal or written form, which will permit Tenant to proceed with the installation of its fit-up and pre-operating activities. Tenant shall take possession of the Premises on the Rent Commencement Date.

**SECTION 3.  Base Rent; Adjustments.**

(a)     Tenant agrees to pay the Landlord, without demand or set off, rent as follows:

(1)     Six Hundred Fifty-Eight Thousand Nine Hundred Ninety-Seven and 92/100 Dollars ($658,997.92) per year (the "Base Rent"), payable in equal monthly installments of Fifty-Four Thousand Nine Hundred Sixteen and 49/100 Dollars ($54,916.49) on the first day of each month, in advance, commencing on the Rent Commencement Date, and thereafter each month through the Lease Term.  If the Rent Commencement Date is a date other than the first of the month, the Rent shall be prorated for the number of days remaining in the month in which the Rent Commencement Date occurs at the stipulated rate of $1,830.55 Dollars per day.

(b)     The Base Rent set forth in Section 4(a)(1) above shall be increased as of the one year anniversary of the Rent Commencement Date  and annually thereafter  during the term hereof by an amount equal to the percentage increase in the CPI-U as defined herein over the Base Rent for the preceding twelve-month period, but in no event shall such increase exceed four percent (4%) of the Base Rent for the preceding twelve-month period.  For these purposes the CPI-U is defined to be the "Consumer Price Index-All Urban Consumers – Northeast Region – Population Size Class C (50,000-500,000), All Items (1982-1984 equals 100 hereinafter called the 'Index')", published by the Bureau of Labor Statistics, United States Department of Labor.  In the event that the Department of Labor ceases to publish the CPI-U Index during the Initial Term or any renewal thereof, the Landlord shall select an alternative index and shall so notify Tenant.  Said alternative index shall use comparable statistics on the purchasing power of the consumer dollar, including the same or comparable region and population.

**SECTION 4.  Landlord's Work and Permits.**

Landlord shall obtain, at its sole cost and expense (except as noted in Section 5 below), all state and municipal permits and approvals required for the construction and occupancy of the Building including, without limitation, all building permits, site plan approvals, water supply and wastewater disposal permits, municipal discharge or sewer hook-on permits, and Act 250 permits ("Landlord's Permits").  Promptly following receipt of Landlord's Permits, Landlord will commence Landlord's Work.  As used herein, "Landlord's Work" shall mean any work, including architectural, engineering, consulting, contract administration, and similar work as well as construction work necessary for: (a) construction of Landlord's Building to the specifications set forth on Exhibit D hereto; (b) connection of Landlord's Building to any necessary water systems and sewerage systems; (c) the construction of all walkways, driveways, parking areas and landscaping on Landlord's Property in accordance with the Site Plan; and (d) any other

3

necessary architectural, plumbing, fixtures and site work for the Building and/or the Premises, including plumbing, HVAC system, all as more specifically set forth on Exhibit D. Landlord shall perform Landlord's Work in a good and workmanlike manner, in accordance with all applicable laws, zoning and building codes, ordinances and regulations, and all other applicable requirements of governmental authorities. Upon completion of Landlord's Work, Landlord shall deliver to Tenant the certificate of a licensed engineer or architect stating that Landlord's Work has been completed substantially in accordance with Exhibit D and in accordance with the applicable governmental statutes, codes, regulations, standards and requirements.

## SECTION 5. Tenant's Work and Relocation Costs; Signs.

Tenant agrees that it will fit-up the Premises in accordance with the plans attached hereto as Exhibit E and the fit-up specifications set forth on Exhibit E. Tenant shall obtain all state and municipal permits and approvals required for its fit-up of the Premises. Tenant's fit-up work will include any and all work necessary for its IT systems, telephone systems, security systems, conveyor systems, rack systems and any and all other fit-up work necessary for its production and distribution, as outlined on Exhibit E. Tenant shall perform its fit-up work in a good and workmanlike manner, in accordance with all applicable laws, zoning and building codes, ordinances and regulations, and all other applicable requirements of governmental authorities. Landlord agrees to provide to Tenant the sum of Two Million Four Hundred Thousand and 00/100 ($2,400,000) Dollars for its fit-up costs and relocation costs (the "Tenant Reimbursement"), in accordance with the payment schedule attached hereto as Exhibit F. The Tenant Reimbursement belongs to Tenant and shall not be amortized over the term of the Lease or repaid to Landlord.

Tenant shall, at Tenant's sole cost and expense, have the right to place its own business identification sign(s) on the Premises. Tenant agrees to maintain such sign(s) in good condition and repair and ensure that the sign(s) are fit for Tenant's intended use including, without limitation, ensuring that the sign(s) are properly wired, maintained and constructed. Tenant shall, at its own expense, obtain the necessary permits and comply with local and state laws regulating its signs. Once Tenant's sign(s) are installed, Tenant will remove, replace, change or alter such signs only with prior local and state approvals if necessary.

## SECTION 6. Option to Extend.

So long as the Tenant is not in default hereunder, the term of this lease may be renewed, as to the Premises, at the option of the Tenant for two (2) additional terms of five (5) years. Such option will be considered automatically exercised at the end of each previous term unless the Tenant gives written notice to the Landlord or its legal representative not less than one hundred eighty (180) days prior to the expiration of the then existing term that the Tenant will not exercise its option to renew. The renewal term shall be upon the same terms, covenants and conditions and with the same rent as adjusted in this lease.

4

## SECTION 7. Rent Net to Landlord.

Except for Landlord's obligations as set forth in Section 11(a) hereof, it is the intention of the Parties that the Rent paid by Tenant to Landlord shall be absolutely net to Landlord and the terms and provisions of this Agreement shall be interpreted and construed to that effect. All costs associated with taxes, utilities, operation and maintenance of the Premises shall be separately assessed, metered or apportioned to the Tenant as follows:

(a)      Taxes: Tenant shall pay to the Landlord, local real estate taxes separately assessed by the Town of Milton, Vermont for the Premises in equal monthly installments, to be adjusted annually on the Rent Commencement Date of each municipal tax year.  Said payment for taxes shall be pro-rated and adjusted between the Landlord and Tenant as of the Rent Commencement Date, or of such termination of Lease, as the case may be, so that the Tenant shall bear the cost only of its proportionate share that falls within the term of its lease.  The Tenant shall also be responsible for any other taxes, assessments or levies made by any federal, state or local authority against the personal property of the Tenant, including but not limited to, inventory, equipment and fixtures.

If any governmental authority imposes, assesses or levies a gross receipts tax on rent or any other tax upon Landlord as a substitute in whole or in part for real estate tax or assessment, the substitute tax shall be deemed to be a real property tax and shall be deemed to have been levied upon the Premises.  Real estate taxes shall not, however, include income taxes except for that portion of the income tax which is the substitute for the real estate taxes which were formerly collected to support local public elementary and secondary education.

Tenant or its designee shall have the right to contest and review all such taxes by legal proceedings, or in such other manner as it may deem suitable (which, if instituted, Tenant or its designee shall conduct promptly at its own cost and expense, and free of any expense to Landlord and, if necessary, in the name of and with the cooperation of Landlord and Landlord shall execute all documents necessary to accomplish the foregoing).

(b)      Insurance:  Tenant shall pay the cost of all insurance to be furnished by Tenant pursuant to Section 10 hereof;

(c)      Utilities:  Tenant shall pay all costs of utility services including without limitation charges for electricity, gas, fuel, telephone, and water and sewer service metered or unmetered to the Premises.

(d)      Maintenance and Repairs:  Tenant shall provide for maintenance and repairs at its own cost and expense, pursuant to Section 11(b) hereof.

(e)      Snow Removal, Lawn Maintenance and Periodic Inspections.  Tenant shall pay to Landlord all costs and expenses associated with the following:  (i) lawn maintenance, including but not limited to mowing, trimming, seeding, and landscaping;  (ii) the removal of snow and ice,

5

including plowing, sanding and salting; (iii) fire alarm monitoring and annual testing; (iv) the cost of periodic inspections required for the heating, air conditioning, plumbing, sprinkler and similar systems located on the Premises; and (v) the repair and maintenance associated with the storm water system servicing the Premises. Landlord shall bill the cost of same to Tenant on a monthly basis or at the convenience of Landlord.

If Tenant wishes to challenge the accuracy or validity of Taxes or other sums payable by Tenant to Landlord herein, it shall give Landlord written notice and within fifteen (15) business days thereof, Tenant shall be entitled to an audit of Landlord's books and records in accordance with generally accepted accounting principles, to be made by Tenant's representatives, at its own cost and expense. Any such audit will take place at Landlord's principal offices, as set forth in Section 35 below. If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be refunded to Tenant within fifteen (15) business days thereof. If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefore, Tenant may offset the amount thereof against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Tenant in full prior to the end of the then current Term shall be refunded to Tenant in cash prior to the end of that Term. If such audit reveals any underpayment by Tenant, Tenant shall disclose same to Landlord and the amount of such underpayment shall be added to the next Rent payment due from Tenant to Landlord.

## SECTION 8. Interest.

Interest shall accrue at the rate of fifteen percent (15%) per annum on any rent, real estate tax payments, or any other Tenant charges pursuant to this Lease Agreement not paid within ten (10) days after written notice has been given by Landlord.

## SECTION 9. Use of the Property.

Tenant may use the Premises for distribution and office space. If the Tenant changes its initial use of the Premises in a manner that necessitates application for zoning or planning approval or compliance with other municipal or state regulations or installation of additional or new fixtures, systems or improvements at any time during the term of this Lease or any renewals thereof, Tenant will prosecute and bear the cost of such applications, installation and/or changes necessary to obtain compliance and approval and Landlord will cooperate and join in such proceedings as owner thereof. The Premises shall not be used for any illegal purpose, nor in violation of any valid law, regulation or ordinance of any governmental body, nor in any manner to create nuisance or trespass, nor in any manner to invalidate the insurance. Tenant hereby agrees to be in compliance with all provisions of any and all statutes, ordinances and regulations imposed by the State of Vermont, the Federal Government, the county, local or any other governmental agency, now or hereafter in force, relating to its use and occupancy of the Premises, and shall bear any expense required to be in compliance.

## SECTION 10. Insurance.

6

The Tenant covenants to provide on or before the commencement of the initial term of this Lease Agreement and to keep enforced during the initial term or any renewal term:

(a)  Pay for and maintain a policy or policies of general liability insurance issued by companies licensed in Vermont, indemnifying Landlord, Tenant, mortgagee or mortgage guarantor as their interests may appear, against all claims or demands for personal injuries to or death of any person, and damage to or destruction or loss of property, which may or may be claimed to have occurred on the Premises or in the vicinity of same, such policies to be in such amounts as Landlord may from time to time reasonably request based on coverage maintained on comparable properties in Vermont, but in any event, in an amount not less than $2,000,000.00 for injury to or death of any one or more persons in any single accident, and not less than $500,000.00 for damage to or destruction of property. Tenant shall deliver a certificate evidencing that such insurance coverage is in full force and effect upon demand by Landlord. Said policy or policies shall provide that there will be no termination without at least thirty (30) days' advance written notice to Landlord of the intent to terminate. Should Tenant's use and occupancy of the Premises make it prudent in the Landlord's reasonable judgment to require special insurance coverage, Landlord may notify Tenant of the additional insurance requirements and Tenant shall promptly obtain such policies.

(b)  Landlord agrees to maintain appropriate casualty and liability insurance on the Building.

(c)  To the extent permitted by such policies and without voiding the insurance provided thereby, the Landlord and Tenant hereby waive their rights of subrogation. This paragraph shall not, however, in any manner limit the liability of the Tenant or the Landlord for damage to property or persons as a result of the negligence on the part of either party. Tenant shall furnish to Landlord upon request the policy or policies required herein.

## SECTION 11.  Obligations for Repairs, Maintenance and Alterations

(a)  <u>Landlord's Obligations</u>.

Landlord covenants and agrees, during the Initial Term and any extension, if this Lease is extended, to perform necessary repairs and replacement to the roof, building foundation, structural walls, the general plumbing and electrical components existing at the time Tenant first occupies the Premises and HVAC system in the Building which comprise the Premises or in which the Premises are located at its cost and expense, to the quality and class at least equal to the original work properly executed. Landlord shall further repair and maintain the sewage and utility lines, outside of the Building provided that such lines are the property of Landlord. Landlord shall not be required to make any such repairs where same were caused or occasioned by an act or omission or negligence of Tenant, any sub-Tenant or their employees, agents, invitees, licensees, visitors or contractors. Except for Landlord's negligence and/or intentional acts or those of its agents, servants, assigns, invitees or employees in the performance of

7

Landlord's obligations as set forth in this Section, Landlord shall not be liable for interruption in or cessation of any service rendered to the Premises due to any cause beyond the Landlord's control including, but not limited to: any accident; the making of repairs, alterations, or improvements; labor difficulties; fuel and electric supplies or shortages.

(b)     Tenant's Obligations.

Except for maintenance and repair to be performed by Landlord pursuant to Section 11(a) hereof, Tenant shall, at its own cost and expense:

(1)     Keep and maintain in good order, condition and repair, the Premises, and each and every part thereof.

(2)     Tenant shall make all repairs and replacements to the Premises made necessary as a result of its negligence and shall make all non-structural repairs and replacements to the Premises, including electrical systems that are reasonably required to keep and maintain the Premises in good order and repair. Tenant shall perform or cause to be performed, regular periodic and preventive maintenance on all heating, air conditioning, plumbing, electrical and similar systems located within the Premises.

(3)     Tenant shall not install, operate or maintain any electrical equipment which will overload the electrical system, or any part thereof, beyond its reasonable capacity for safe and proper operation as determined by the Landlord, or which does not bear underwriter's approval; Tenant shall not perform, or permit to be performed, any act or carry on any practice which may damage, mar or deface the Premises.

(4)     Tenant shall not store materials or equipment outside the buildings on the Premises if such outside storage is prohibited by applicable permits and Tenant shall not place storage containers or unregistered storage trailers on the Premises for any period longer than thirty (30) days without Landlord's prior consent, not to be unreasonably withheld.

(5)     Tenant shall place all trash in receptacles in areas designated by Landlord and provide for removal of same.

(6)     Tenant shall not use or occupy the Premises in a manner which would unreasonably disturb adjoining property owners.

(7)     Tenant shall use commercially reasonable efforts to keep the Building free from pests and other unwanted animals including, but not limited to, rodents, insects and reptiles.

Upon the default of Tenant in making such repairs and replacements, the Landlord may, but shall not be required to, make such repairs and replacements for the Tenant's account and the expenses thereof shall be collectable against Tenant as additional rent. If the Landlord desires to make any such repairs and replacements, the Landlord shall obtain the prior consent of the

8

Tenant before making such repairs and replacements, unless an emergency exists that makes Tenant's prior consent impracticable.

## SECTION 12.  Force Majeure.

During the lease term, Landlord or Tenant shall not be required to perform any term, condition, or covenant in this Agreement so long as such performance is delayed or prevented by force majeure, which shall mean acts of God, epidemics, cyclones, floods, drought, or by reason of war, declared or undeclared revolution, civil commotion or strife, acts of public enemies, blockade or embargo, or by reason of any new law, proclamation, regulation, ordinance or demand by any government authority, and any other cause not reasonably within the control of Landlord or Tenant and which, by the exercise of due diligence, Landlord or Tenant is unable, wholly or in part, to prevent or overcome.

## SECTION 13.  Reserved Access Rights of Landlord.

Landlord reserves the right to enter the Premises at reasonable hours with reasonable prior notice (except in case of emergency) to make reasonable inspections or additions as may be required or permitted under the provisions of this Agreement; to exhibit reasonably the same to prospective purchasers or to perform any act related to the safety, protection or preservation of the Premises; and during the three month period prior to the end of the leased term, for the purposes of exhibiting the Premises to prospective Tenants.  Landlord shall use reasonable good faith efforts to minimize disruption of Tenant's business operations.

## SECTION 14.  Quiet Enjoyment.

Landlord covenants that the Tenant upon paying the rent and complying with the provisions of this Agreement, shall peaceably and quietly have, hold and enjoy the Premises for the term of this Agreement.

## SECTION 15.  Alterations, Improvements, and Additions.

No alterations, improvements or additions to the Premises shall be made by Tenant without the prior written consent of Landlord which shall not be unreasonably withheld or delayed.  All leasehold improvements installed in the Premises by Tenant shall automatically become the property of Landlord and shall not be removed upon the expiration or termination of this Agreement; provided, however,  so long as Tenant restores the Premises back to the same condition that existed prior to the Rent Commencement Date, Tenant shall be entitled to remove the following from the Premises, which shall not be considered leasehold improvements and shall remain at all.times the personal property of Tenant: all personal property and all trade fixtures, machinery, office, manufacturing and warehouse equipment, racks and shelving. Notwithstanding anything contained herein, personal property shall not include plumbing, heating, ventilating and air conditioning equipment, or any mechanical equipment furnished or installed by Landlord.

9

## SECTION 16. Storm Water.

Tenant shall at all times maintain the Premises in accordance with all existing regulations issued by the United States Government and the State of Vermont Department of Environmental Conservation with respect to all clean water legislation and all permits issued in compliance therewith that affect the Premises including, without limitation all storm water regulations adopted by the State of Vermont Department of Environmental Conservation (the "Storm Water Regulations"). Tenant will at all times operate its business located on the Premises in accordance with all of the terms, restrictions and conditions of Authorization to Discharge Permit #3-9015, attached hereto as Exhibit G.

## SECTION 17. Hazardous Materials.

(a)　　Tenant shall not use, transport, store, dispose of or in any manner deal with hazardous materials on the Premises or any adjacent lands and premises of Landlord (collectively the "Property"), except in compliance with all applicable federal, state and local laws, ordinances, rules and regulations. The term "hazardous materials" as used in this Agreement shall include, without limitation, gasoline, petroleum products, explosives, radioactive materials, or any other substances or materials defined as a hazardous or toxic substance or material by any federal, state or local law, ordinance, rule or regulation.

(b)　　Except as provided in Section 17(c), Tenant unconditionally and irrevocably indemnifies and agrees to defend and hold harmless Landlord and its officers, employees, agents, contractors and those claiming by, through or under Landlord, from and against all loss, cost and expense (including attorneys' fees) of whatever nature suffered or incurred by Landlord on account of the existence at or on the Property, or the release or discharge at, on, from or to the Property, during the lease term, of any hazardous material, including any claims, costs, losses, liabilities and expenses arising from the violation (or claimed violation) of any law, rule, regulation or ordinance or the institution of any action by any party against Tenant, Landlord or the Property based upon nuisance, negligence or other tort theory alleging liability due to the improper generation, storage, disposal, removal, transportation or treatment of any hazardous material or the imposition of a lien on any part of the Property under any law pursuant to which a lien or liability may be imposed on Landlord due to the existence of any hazardous material. Tenant unconditionally and irrevocably guarantees the payment of any fees and expenses incurred by Landlord in enforcing the liability of Tenant and this indemnification should Landlord prevail in such action. If any Remedial Work is required because of, or in connection with, any occurrence or event covered by the indemnity set forth in this Section 17(b), Tenant shall either perform or cause to be performed the Remedial Work in compliance with the applicable law, regulation, order or agreement, or shall promptly reimburse Landlord for the cost of such Remedial Work. If Tenant elects to perform the Remedial Work, all Remedial Work shall be performed by one or more contractors selected by Tenant and approved in advance in writing by Landlord and under the supervision of a consulting engineer, selected by Tenant and approved in advance in writing by Landlord. Otherwise, Landlord shall select the contractor(s)

10

and the consulting engineer. All costs and expenses of such Remedial Work shall be paid either directly, or in the form of reimbursement to Landlord, by Tenant including without limitation, the charges of such contractor(s) and the consulting engineer, and Landlord's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. If Tenant shall fail to timely commence, or cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Landlord may cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, shall be covered by the indemnity set forth in this Section 17(b). All such costs and expenses shall be due and payable upon demand therefor by Landlord.

(c)    Landlord unconditionally and irrevocably indemnifies and agrees to defend and hold harmless Tenant and its officers, employees, agents, contractors and those claiming by, through or under Tenant, from and against all loss, cost and expense (including attorneys' fees) of whatever nature suffered or incurred by Tenant on account of the existence at or on the Property, or the release or discharge at, on, from or to the Property, prior to the Rent Commencement Date or thereafter if such release or discharge is caused by the Landlord, its officers, employees, agents or contractors, of any hazardous material, including any claims, costs, losses, liabilities and expenses arising from the violation (or claimed violation) of any law, rule, regulation or ordinance or the institution of any action by any party against Tenant, Landlord or the Property based upon nuisance, negligence or other tort theory alleging liability due to the improper generation, storage, disposal, removal, transportation or treatment of any hazardous material or the imposition of a lien on any part of the Property under any law pursuant to which a lien or liability may be imposed on Tenant due to the existence of any hazardous material. Landlord unconditionally and irrevocably guarantees the payment of any fees and expenses incurred by Tenant in enforcing the liability of Landlord and this indemnification should Tenant prevail in such action. If any Remedial Work is required because of, or in connection with, any occurrence or event covered by the indemnity set forth in this Section 17(c), Landlord shall perform or cause to be performed the Remedial Work in compliance with the applicable law, regulation, order or agreement or promptly reimburse Tenant for the cost of such remedial work.  . If Landlord elects to perform the Remedial Work, all Remedial Work shall be performed by one or more contractors selected by Landlord and approved in advance in writing by Tenant and under the supervision of a consulting engineer, selected by Landlord and approved in advance in writing by Tenant. Otherwise, Tenant shall select the contractor(s) and the consulting engineer. All costs and expenses of such Remedial Work shall be paid either directly, or in the form of reimbursement to Tenant, by Landlord including without limitation, the charges of such contractor(s) and the consulting engineer, and Tenant's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. If Landlord shall fail to timely commence, or cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Tenant may cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, shall be covered by the indemnity set forth in this Section 17(c). All such costs and expenses shall be due and payable upon demand therefor by Tenant.

11

(d)     The obligations of Landlord and Tenant under this Section 17 shall survive the termination of this Agreement.

## SECTION 18.  Potential Future Expansion.

Subject to the provisions of this Section 18, Tenant shall have the right during the Lease Term, to request that Landlord construct an addition within the "Potential Future Expansion" area depicted on the Site Plan for Tenant's storage and warehouse purposes. Any such addition will have the following effects on Tenant:  (i) any such addition shall become a part of the Premises upon delivery to Tenant (for purposes of this Section 18, the "Expanded Premises"); (ii) Tenant shall pay additional Rent in an amount equal to the Rent then payable under Section 3 hereof for the Expanded Premises, which additional Rent shall commence upon issuance of a certificate from the Department of Public Safety.  If the date upon which said certificate is issued is a date other than the first of the month, then the additional Rent shall commence as of the first day of the next succeeding month; and (iii) Tenant shall pay Taxes and any other charges due and payable hereunder for the Expanded Premises.  Thereafter, this Lease shall  be so amended, provided, however, at any time upon request of either party, Landlord and Tenant shall enter into an amendment to this Lease evidencing the Expanded Premises and corresponding changes in Rent, Taxes and other charges.

## SECTION 19.  Fire and Other Casualty.

(a)     If the Premises or any portion thereof is damaged by fire or any other casualty and is unable to be occupied by Tenant, the following provisions shall apply:

(i)  If the damage is to such extent that the cost of restoration, as reasonably estimated by Landlord, will equal or exceed fifty percent (50%) of the replacement cost of the Building on the date the damage is incurred, or if less than one year remains on the term of this Lease, Landlord may, not later than the 60th day following the damage, give Tenant a notice stating that Landlord elects to terminate this Lease.  If such notice shall be given:  (1) this Lease shall terminate on the third day after the giving of said notice; (2) Tenant shall surrender possession of the Premises within a reasonable time thereafter; and (3) all rent shall be apportioned as of the date of such surrender and any rent paid for any period beyond said date shall be repaid to Tenant.

(ii)  If the cost of restoration, as reasonably estimated by Landlord, shall amount to less than  fifty percent (50%) of the replacement cost of the Building on the date the damage is incurred, or if despite the cost Landlord does not give notice to the Tenant of its election to terminate in accordance with subparagraph (a)(i) , above, the Landlord shall restore the premises with reasonable promptness, subject to delays beyond Landlord's control and delays in making of insurance adjustments by Landlord, and Tenant shall not have the right to terminate this Lease on account of such damage.

12

Landlord need not restore fixtures, improvements or other property of Tenant.

In any case in which the use of the Premises is affected by any such damage, there shall be either an abatement or a reduction in rent during the period for which the Premises are not reasonably usable for the purposes for which they are leased hereunder, the amount of such abatement or reduction to fairly and appropriately reflect the degree to which the Tenant is thereby prevented from using the Premises for such purposes. The words "restoration" and "restore" as used in this Section shall include repairs. In the event that Landlord fails to repair or restore the Premises in the manner set forth herein or otherwise fails to pursue such restoration or repairs in a diligent manner, the Tenant may terminate this Agreement thirty (30) days after Tenant notifies Landlord in writing of such default and Landlord fails to make or complete said repairs or restoration within said thirty (30) day period.

(b)    Termination of this Agreement in accordance with the foregoing provisions shall not prejudice the rights and remedies of Landlord and Tenant under this agreement prior to such termination, and any rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant.

## SECTION 20. Eminent Domain.

During the term of this Agreement, if the whole of the premises or such portion of which materially adversely effect the Tenant s use and enjoyment of the premises is taken in a condemnation proceeding or by any right of eminent domain, this agreement shall terminate on the date of such taking, and the Base Rent and any additional rent reserved herein shall be apportioned and paid to the date of such taking. The Tenant shall have no interest in any damages awarded the Landlord in compensation for any taking in condemnation or eminent domain with respect to the value of the Property and the Facility. The Tenant may maintain a separate action for any damages sustained by Tenant by reason of said condemnation or proceeding for the taking of Tenant s leasehold estate.

## SECTION 21. Default after Occupancy.

(a)    Tenant shall be in default under this Agreement, and the Landlord shall have the right, without demand, at its option and without prejudice to its rights hereunder, to recover possession of the Premises by summary process or any other lawful means, if:

(i)    Tenant shall fail to pay Base Rent, or any other amounts required hereunder, when due and such failure continues for ten (10) days after Tenant has received written notice of such failure from Landlord; or

(ii)    Tenant shall fail to perform any of the other covenants and agreements therein contained to be kept and fulfilled on the part of Tenant and such failure continues for thirty (30) days after Tenant has received written notice of such failure from Landlord, or if such

13

failure cannot be cured within thirty (30) days but Tenant fails to take reasonable, prompt steps to cure after Tenant has received written notice of such failure from Landlord; or;

        (iii)     Tenant shall file a voluntary petition in bankruptcy or take the benefit of any insolvency Act or be dissolved or adjudicated bankrupt, or if a receiver shall be appointed for its business or its assets and the appointment of such receiver is not vacated within sixty (60) days after such appointment, or if the Tenant shall make an assignment for the benefit of its creditors, or if the Tenant s interest herein shall be sold under execution; or

        (iv)     Tenant or its shareholders or members shall approve dissolution or liquidation of Tenant; or

        (v)     A final unappealable judgment which, with other outstanding final judgments against Tenant, exceeds an aggregate of $100,000.00 shall be rendered against Tenant, and if such judgment shall not have been discharged within thirty (30) days of issuance thereof;

        (vi)     Tenant shall abandon or vacate the Premises (defined as failure to open the Premises for the conduct of Tenant's business for 14 consecutive days or more).

        (b)     After default by Tenant or any failure by Tenant to perform or satisfy any of the covenants or agreements contained herein, the acceptance of rent or failure to reenter by the Landlord shall not be held to be a waiver of its rights to terminate this Agreement, unless notice of such waiver is signed by Landlord and the Landlord may reenter and take possession of the Premises the same as if no rent had been accepted after such default.

        (c)     Should Landlord elect to reenter or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by the law, it may make such alterations and repairs as may be necessary in order to relet the Premises or any part thereof, for such term or terms (which may be for a short term extending beyond the Initial Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable and upon such reletting such rentals received by Landlord from such reletting shall be applied;

        (i)     first, to the payment of any rent or other indebtedness due hereunder from satisfaction if specifically set forth in a separate instrument signed by Landlord; and

        (ii)     second, to the payment of the cost of any such alterations and repairs.

        Any amount remaining shall be held by Landlord and applied in payment of future rent or other Tenant payment obligations as the same may become due and payable hereunder. If such rentals received from such reletting during that month by Tenant hereunder, then Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly.

        (d)     Landlord may recover from Tenant from time to time, all damages, it may incur by reason of Tenant's default, including the cost of enforcing its rights hereunder, the cost of

recovering the Premises, reasonable attorneys' fees, and the worth, at the time of such termination, of the excess, if any, of the amount of all rent and charges equivalent to rent reserved in this Agreement for the remainder of the Agreement term over the then reasonable rental value of the Premises for the remainder of the stated term, all of which amount shall be immediately due and payable from Tenant to Landlord.

(e)    Anything contained herein to the contrary notwithstanding, in the event of any uncured default by Tenant, Landlord shall use reasonable efforts to mitigate its damages.

## SECTION 22.  Landlord Default.

If Landlord shall fail to perform or comply with any of the agreements, terms, covenants or conditions in this Lease Agreement for a period of thirty (30) days after notice from Tenant to Landlord specifying the items in default, or in the case of a default or contingency which cannot with due diligence be cured within such thirty (30) day period, Landlord shall fail to commence within said thirty (30) day period the steps necessary to cure the same and thereafter to prosecute the curing of such default with due diligence (it being understood that the time of Landlord within which to cure shall be extended for such period as may be necessary to complete the same with due diligence), then such failure shall constitute "Landlord's Event of Default." Upon the occurrence of a Landlord's Event of Default, Tenant shall have the right, at its election, to : (a) sue for damages by reason of the default, or (b) undertake to cure such Landlord's Event of Default in which case Landlord shall promptly reimburse Tenant for all costs and expenses incurred in connection with such cure, and shall have all other rights and remedies as may be available under applicable law a time of the occurrence of the Landlord's Event of Default  In the event that any failure by Landlord to satisfy its obligations under the Lease would constitute a default after the delivery of notice and passage of time without cure causes (i) an imminent threat to the life or safety of any person, (ii) an imminent threat to the structural  integrity of the building on the Premises or (iii) an imminent threat of water damage to a portion of Tenant's inventory that is not de minimus or immaterial in nature located in the Premises, Tenant shall have the right to cure such situation after five (5) days written notice to Landlord.

## SECTION 23.  Liability and Indemnification.

(a)    Tenant shall indemnify Landlord and save Landlord harmless from suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of the use or occupancy of the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, invitees, licensees, or concessionaires, including a breach by Tenant of its obligations pursuant to this Lease.

(b)    Tenant shall give prompt notice to Landlord in case of fire or accidents on the Premises or defects therein or in any fixtures or equipment.

     (c)    Landlord shall indemnify Tenant and save Tenant harmless from suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from any act or omission of Landlord, its agents, contractors, employees, servants, invitees, licensees, or concessionaires, including a breach by Landlord if its obligations pursuant to this Lease.

## SECTION 24.  Representations and Warranties.

The Landlord and the Tenant make the following representations and warranties.

     Landlord represents and warrants to Tenant and covenants with Tenant as follows:

     1.    Landlord is a limited liability partnership, organized and in good standing under the laws of the State of Vermont and has the full power, right and authority to enter into this Lease and to perform all of its obligations under this Lease.

     2.    Execution and delivery by the Landlord of this Lease Agreement has been duly authorized by all necessary action on the part of the Landlord, including all necessary approval of its partners of the transactions contemplated therein.

     3.    As of the Rent Commencement Date, to the best of Landlord's knowledge, the Building and the underlying property shall be in conformity with all applicable zoning, subdivision, Act 250, building, land use, fire and safety, handicapped access, regulations and codes of governmental authorities having jurisdiction over the building or underlying property and with all applicable covenants or restrictions.

     4.    Landlord has no knowledge of any pending or threatened condemnation proceedings or other proceedings in the nature of eminent domain in connection with the Property.

     5.    To the best of Landlord's knowledge, there are no litigation or proceedings pending or to Landlord's knowledge threatened, against or relating to the Building or the underlying property.

     Tenant represents and warrants to Landlord and covenants Landlord as follows:

     1.    Execution and delivery by the Tenant of this Lease Agreement has been duly authorized by all necessary action on the part of the Tenant.

## SECTION 25.  Accord and Satisfaction.

     No payment by Tenant or receipt by Landlord of a less amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall an endorsement or statement on any check or any letter accompanying any check or

payment as rent be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in the Agreement provided. Partial payment shall only be construed as an accord and satisfaction if specifically set forth in a separate instrument signed by Landlord.

## SECTION 26. Subordination, Attornment and Collateral Assignment.

(a)     At the option of Landlord or any mortgagee, this Agreement and the Tenant's interest hereunder, shall be subject and subordinate, upon terms and conditions consistent with this Agreement, to any mortgage, deed of trust, or any method of financing or refinancing now or hereafter placed against the Premises and to all renewals, modifications, replacements, consolidations and extensions thereof, provided that no subordination or subjecting of this Agreement and Tenant's interest shall be effective until Landlord has obtained and delivered to Tenant a fully executed non-disturbance agreement as described in Paragraph 26(d) below.

(b)     If the holder of record of a first mortgage of Landlord's interest in the Premises shall have given prior written notice to Tenant that it is the holder of said mortgage and that such notice includes the address at which notices to such mortgagee are to be sent, then the Tenant agrees to give notice to the holder of record of such first mortgage, simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided, and shall permit the holder of record and such first mortgage to, within thirty (30) days after receipt of said notice, correct or remedy such default before Tenant may take any action under this Lease by reason of such default.

(c)     Tenant shall in the event of the sale or assignment of Landlord's interest in the Premises, or in the event of the issuance of a certificate of non-redemption in any proceedings brought for the foreclosure of a mortgage of Landlord's interest in the Premises, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, attorn to the purchaser or foreclosing mortgagee and recognize such purchaser of foreclosing mortgagee as Landlord under this Lease, provided that any defaults are cured as provided in Paragraph 26(b) above.

(d)     Landlord shall use reasonable efforts to obtain from any mortgagee or other Lender holding an interest in the Premises superior to Tenant's interest under this Agreement: (i) a non-disturbance agreement in form and substance reasonably satisfactory to Tenant, providing that so long as the Tenant performs all of its obligations hereunder and agrees to attorn to such mortgagee or beneficiary of deed of trust, the Tenant's right to possession under this Agreement shall remain in full force and effect for the full term hereof, as extended; (ii) further assurances from said mortgagee that it will claim no interest in Tenant's personal property of any kind or nature.

(e)     Notwithstanding any provision elsewhere in this Lease Agreement, the Tenant shall have the right to mortgage, grant a security interest in, or assign its interest in this Lease Agreement as collateral for loans (including renewals, modifications, replacements,

17

consolidations and extensions thereof) from time to time without Landlord's prior consent or the prior consent of any mortgagee holding a mortgage on the Premises, provided that no such mortgage, security interest or assignment shall extend to or affect the fee, the reversionary interest, or the estate of the Landlord or any mortgagee in and to the fee to the Premises.

## SECTION 27.  Estoppel Certificates.

Either party, upon written request of the other, shall furnish to the other party, a statement duly executed and acknowledged, to any mortgagee or purchaser, or any other person or entity specified in such request:

(a)     as to whether this Lease has been amended and the substance of such amendment;

(b)     as to the validity and force and effect of this Lease;

(c)     as to the existence of any default hereunder;

(d)     as to the existence of any offsets, counterclaims or defenses hereto on the part of the party executing the certification; and

(e)     as to any other matters as may reasonably be so requested.

This statement must be furnished within ten (10) days after receipt of the request and the contents thereof shall be binding upon the party executing the certification.

## SECTION 28. Surrender of Premises: Holding Over.

(a)     At the expiration of the Initial Term or any extension thereof, Tenant shall surrender the Premises in the same condition in which they were upon the Rent Commencement Date, reasonable wear and tear excepted, and shall deliver all keys and combinations to locks to Landlord. Before surrendering said Premises, Tenant shall remove all personal property including all trade fixtures, and shall repair any damage caused thereby as provided in Section 13 above. Tenant s obligation to perform this provision shall survive the lease term. If Tenant fails to remove its property upon the expiration of the lease term, Landlord may, among other remedies, cause such properties to be removed and disposed of with the costs of such removal and disposal to be borne by the Tenant.

(b)     Any holding over after the expiration of the lease term or any renewal term shall be construed to be a tenancy at will, and shall be on the terms herein so far as is applicable, except that Landlord reserves the right to increase the Base Rent upon fifteen (15) days  advance written notice to Tenant.

## SECTION 29. Successors and Assigns.

18

All rights and liabilities herein given to, or imposed upon, the respective Parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors and assigns of the said Parties; and if there shall be more than one Tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of the Tenant unless the assignment to such assignee has been approved by Landlord in writing.

## SECTION 30. Assignment, Subletting.

Tenant shall not assign this Agreement, or sublet the Premises nor any part thereof without the written consent of the Landlord; provided, however, that such consent shall not be unreasonably withheld or delayed upon the Landlord having been provided adequate information to make an informed judgment that any assignee or sub-Tenant has the financial ability to carry out the terms and obligations of this Agreement, or the terms of the proposed sublease, and upon securing written confirmation from Tenant that it shall remain fully liable for the performance of this Agreement.

## SECTION 31. Non-Waiver.

(a)     No agreement to accept a surrender of the Premises prior to the expiration of the lease term shall be valid unless in writing and signed by an authorized representative of Landlord. The delivery of keys by or on behalf of Tenant for any part of the Premises to any employee or partner of Landlord or to Landlord s agent or any employee of such agent shall not operate as a termination of this Agreement or as a surrender of the Premises.

(b)     The failure of Landlord or Tenant to seek redress for violation or breach of, or to insist on the strict performance of any covenant of this Agreement whether by express waiver or otherwise, shall not be construed as a waiver of any subsequent violation or breach or the same covenants.

(c)     The receipt by Landlord of rent with knowledge of the breach of any covenant of this Agreement shall not be deemed a waiver of such breach.

(d)     The failure of Landlord to enforce any of the rules and regulations against Tenant or any other tenant in the Property shall not be deemed a waiver of any such rule or regulation.

(e)     Landlord's consent to, or approval of, any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord s consent to or approval of any subsequent similar act by Tenant.

## SECTION 32. Severability.

It is the intention of the Parties hereto that if any provision of this Agreement is capable of two constructions, one of which would render the provision valid, then the provision shall

19

have the meaning which renders it valid. If any term or provision or any portion thereof of this Agreement, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

## SECTION 33. Entire Agreement. Applicable Law.

This Agreement with any exhibits and riders attached hereto contains the entire agreement of the Parties and no representations, inducements, promises or agreements not embodied herein shall be of any force or affect, unless the same are in writing and signed by or on behalf of the party to be charged. The captions of particular sections are inserted as a matter of convenience and in no way affect or define the scope or intent of this Agreement or any provision thereof. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Vermont.

## SECTION 34. Captions.

The captions and numbers appearing herein are inserted only as a matter of convenience and are not intended to define, limit, construe, or describe the scope or intent of any section or paragraph, nor in any way affect this Agreement.

## SECTION 35. Notices.

Any notice required to be given by the terms of this Agreement shall be deemed received three (3) days after deposit in the United States mails, sent by Certified Mail, Return Receipt Requested,

| | |
|---|---|
| If to Landlord: | Timothy R. Miller<br>The Miller Realty Group, LLP<br>599 Avenue D<br>Williston, VT  05495 |
| With a copy to: | Peter M. Doremus, Esq.<br>Doremus & Kantor<br>112 Lake St., Suite 3<br>P.O. Box 445<br>Burlington, VT 05402-0445 |
| If to Tenant: | America's Gardening Resource, Inc.<br>ATTN:  Cynthia Turcot<br>128 Intervale Road<br>Burlington, VT 05401 |

20

With a copy to:                    Peter Erly,  Esq.
                                   Gravel and Shea
                                   76 St. Paul Street
                                   PO Box 369
                                   Burlington, VT  05402-0369

## SECTION 36. Recording.

Landlord and Tenant agree that this Agreement shall not be recorded. At Tenant s option and expense, a Memorandum of Lease may be recorded which includes the information required by 27 V.S.A. Section 341(c), but in no event includes the rental provisions in Section 5 nor the insurance provisions in Section 12.

## SECTION 37. Waiver of Jury Trial.

In the event the Landlord shall commence any summary proceedings or action for nonpayment of Base Rent or additional rent hereunder, the Parties hereto waive a trial by jury on any and all issues arising in connection therewith, or the Tenant s use or occupancy of the Premises. In the event Tenant shall commence any action against Landlord for failure to perform any of the covenants or agreements herein contained to be kept and fulfilled on the part of the Landlord, the Parties hereto waive a jury trial on any and all issues arising in connection therewith.

## SECTION 38.  Limitation of Liability.

Notwithstanding anything to the contrary contained in this Lease, in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed, honored or performed by Landlord, Tenant shall look solely to the estate and property of the Landlord in the Premises and any proceeds there from, for the collection of any monetary judgment (or any other judicial procedures requiring the payment of money by Landlord), and no other property or assets of Landlord shall be subject to levy, execution or other procedures for satisfaction of such judgment.

## SECTION 39.  End of Term.

At the end of the Term, extensions, or upon termination of this Lease, Tenant shall (a) leave the Demised Premises in broom clean and in good condition, ordinary wear and tear and casualty excepted; (b) remove all of Tenant's property with the exception of lighting fixtures and HVAC equipment, whether or not attached to the Demised Premises; (c) remove all Tenant's signs and restore that portion of the Demised Premises on which they were placed; and (d) repair all damage caused by moving.  If Tenant leaves any property in the Demised Premises that Landlord has directed Tenant to remove, Landlord may:  (i) dispose of it and charge Tenant for the cost (plus overhead) of removal and disposal; (ii) keep it as abandoned property; (iii) request

21

Tenant to remove it at Tenant's expense; or (iv) charge Tenant the monthly per diem holdover Rent for storage of the property. Tenant shall not be required to remove any permanent improvements to the Demised Premises.

## SECTION 40. Sale of Premises.

(a)     If Landlord receives a bona fide third-party offer (the "Third Party Offer") to sell the Premises during the Initial Term, then so long as there exists no uncured default hereunder, Landlord shall notify Tenant by written notice of said offer. Said notice shall give Tenant fifteen (15) days in which to exercise its right to purchase the Premises upon the same terms and conditions as outlined in the Third Party Offer. Tenant shall give notice of its election to purchase the Premises or not to purchase the Premises by written notice sent via certified mail, return receipt requested, to Landlord, within said 15 day period. If the Tenant elects to purchase the Premises in accordance with the terms of the Third Party Offer, the Tenant shall have thirty (30) days to close from the date of its written response. If the Tenant fails to give the Landlord a written response within the 15 day period or gives Landlord written notice that it does not elect to purchase the Premises, this right to purchase shall be null and void and of no further force or effect. So long as the Premises have not been conveyed during the Initial Term and provided there exists no uncured default hereunder, Tenant shall have the same rights to purchase the Premises as set forth herein, provided Landlord is willing to accept the terms of any number of subsequent Third Party Offers. Landlord and Tenant agree that the right to purchase the Premises, if not exercised as outlined herein, shall be null and void and of no further force or effect and that no further documents need to executed or recorded as evidence of same. Tenant may not assign its rights, duties or obligations under the Right of First Refusal.

## SECTION 41. Early Termination of Lease for 5 New England Drive.

In consideration for the terms of this Lease, Landlord and Tenant have agreed to an early termination of the Essex Lease. Tenant agrees to execute a written termination of the Essex Lease on the Rent Commencement Date in substantially the form attached hereto as Exhibit H.

IN WITNESS WHEREOF, the Parties hereto have executed this Lease Agreement, as of the date first above-written.

IN PRESENCE OF:                          THE MILLER REALTY GROUP, LLP

_Ellen Desjardin_                        _[signature]_
Witness                                  Duly Authorized Agent

IN PRESENCE OF:                          AMERICA'S GARDENING RESOURCE, INC.

_Ellen Desjardi_                         _[signature]_
Witness                                  Duly Authorized Agent

22

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

At *Burlington VT* in said County and State, this 9 day of December, 2011, personally appeared *Robert Miller* _____, Member and duly authorized agent of THE MILLER REALTY GROUP, LLP and he acknowledged this instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of THE MILLER REALTY GROUP, LLP.

Before me, *Ellen Desjardin* _____
Notary Public
My commission expires: 02/10/15

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

At *Burlington VT* in said County and State, this 9 day of December 2011, personally appeared *Cindy Turcot* _____, duly authorized agent of AMERICA'S GARDENING RESOURCE, INC. and he/she acknowledged this instrument, by him/her sealed and subscribed, to be his/her free act and deed and the free act and deed of AMERICA'S GARDENING RESOURCE, INC.

Before me, *Ellen Desjardin* _____
Notary Public
My commission expires: 02/10/15

23

## Exhibit List

**The Miller Realty Group, LLP to America's Gardening Resource, Inc.**

Exhibit A        Property Description

Exhibit B        Site Plan

Exhibit C        Covenants, Restrictions and Easements

Exhibit D        Landlord's Building Specifications

Exhibit E        Tenant's Plans and Fit-Up Specifications

Exhibit F        Tenant Reimbursement Payment Schedule

Exhibit G        Stormwater Discharge Permit No. 3-9015

Exhibit H        Termination of Essex Lease

## Exhibit A

Being all and the same property conveyed to The Miller Realty Group, LLP by Warranty Deed of Greater Burlington Industrial Corporation dated October 14, 2011 and recorded in Volume _____, Page ____ of the Milton Land Records, and more particularly described as follows:

Property identified as "Original Lot 1" and "Original Lot 2" on a plat prepared for the Greater Burlington Industrial Corp., Catamount Industrial Park, Gonyeau Road & U.S. Route 7, Milton, Vermont entitled "Lots 1 & 2 Boundary Line Adjustment Plat" dated June 23, 2011, last revised July 26, 2011, prepared by Lamoureux and Dickinson Consulting Engineers, Inc., and recorded in Map Slide _____ of the Town of Milton Land Records.

Also, being all of Lots 1 and 2 as depicted on a plan entitled "Catamount Industrial Park, Route 7, Milton, Vermont," dated April 22, 1983, last revised September 15, 2008, prepared by Trudell Consulting Engineers, Inc. and recorded in Map Slide 271C of the Town of Milton Land Records (the "Land Records").

The above described property is conveyed subject to and with the benefit of certain covenants, conditions, easements and rights of way as set forth in a document entitled "Protective Covenants for Catamount Industrial Park, Milton, Vermont," dated June 13, 1984, and recorded in Volume 85 at Pages 292-302 of the Milton Town Land Records as amended by First Amendment to Protective Covenants for Catamount Industrial Park dated June 29, 1999 recorded in Volume 203 at Page 144 of the Town of Milton Land Records.

The property is subject and benefitted by the following: (i) State of Vermont Wastewater System and Potable Water Supply Permit WW-4-3718 dated August 24, 2011, recorded in Volume 408, Page 312 of the Land Records; (ii) the terms and conditions of the Town of Milton Development Review Board Approval dated August 11, 2011, Notice of which is recorded in Volume 407, Page 126 of the Town of Milton Land Records; and (iii) Act 250 Permit No. 4C0550-19 dated September 15, 2011 and which contains the following restrictions:

"The Permittees shall adhere to the following conditions regarding archaeology site VT-CH-21 and VT-CH-101:
a.     The Permittees will identify all areas to the north and east of the line marking the limits of the archeological buffer, including VT-CH-21 and VT-CH-101, as a not-to-be-disturbed archeological buffer zone on all relevant site plans. Copies of the revised site plans shall be submitted to the District #4 Environmental Commission and the Division for Historic Preservation ("DHP").
b.     Topsoil removal, grading, scraping, cutting, filling, stockpiling, logging or any other type of ground disturbance is prohibited within the archeological buffer zone without written approval of the District #4

1

Environmental Commission and the DHP. Construction of a new gravel drive is permitted without prior approval within the archeological buffer zone for VTCH-101 provided that all construction and construction related activity occur on top of geotextile fabric placed on the existing ground surface.

c.      An exclusionary fence constructed of snow-fencing or other structural barrier shall be erected around the perimeters of all archeological buffer zones during all project construction activity. The barrier fencing within the VT-CH-101 buffer zone can be modified to allow construction of the gravel drive. All fences must be put in place prior to the commencement of construction.

d.      To ensure long-term protection of the archeological buffer zones, concrete markers with inserted metal plaques referencing the site number and the phrase "no ground disturbance allowed" shall be placed along the edge of each of the archeological buffer zones. A minimum of three concrete markers shall be placed in each buffer zone. The concrete markers may be supplemented by other visual references such as decorative fencing, hedges, or tree plantings with the stipulation that all excavation for these components occurs along or outside of the respective buffer edge.

e.      Any proposed changes to the Stannard House, including, but not limited to, stabilization, rehabilitation, relocation, or demolition will be submitted to the Division for Historic Preservation and the District Commission for review and comment prior to the commencement of the proposed changes.

f.      The permittee will draw up and execute covenants protecting VT-CH-21 and VT-CH-101 and enter them in the deed for the property. The covenants shall reference all the above restrictions and copies shall be filed with the District #4 Environmental Commission and the Division."

Reference is made to the aforementioned instruments, the records thereof and the references therein contained, all in further aid of this description.



EXHIBIT B

OVERALL SITE PLAN

## Exhibit C

**The Miller Realty Group LLP to America's Gardening Resource, Inc. Lease**
**Covenants, Restrictions and Easements**

a.　Permanent and Temporary Construction Easement (Municipal Sewer Line over Lot 2) from Greater Burlington Industrial Corporation to the Town of Milton, by Easement Deed dated February 1, 2007 and recorded in Volume 341, Page 313 of the Land Records.

b.　Permanent and Temporary Construction Easement (Municipal Sewer Line over Lot 1) from Greater Burlington Industrial Corporation to the Town of Milton, by Easement Deed dated February 1, 2007 and recorded in Volume 341, Page 319 of the Land Records. The access easement set forth in this Deed will be relinquished by the Town of Milton in accordance with a Quit Claim Deed from the Town to Miller Realty Group, LLP, which will be recorded upon completion of the access easement referenced in (c) below.

c.　Easement Deed for access from The Miller Realty Group, LLP to the Town of Milton, dated October 14, 2011 and to be recorded in the Town of Milton Land Records.

d.　Easement Deed to Greater Burlington Industrial Corporation, dated April 26, 1984 and recorded in Volume 84 at Page 304.

e.　Easement Deed to Greater Burlington Industrial Corporation, dated May 8, 1984 and recorded in Volume 84 at Page 473.

f.　Quitclaim Deed to Greater Burlington Industrial Corporation recorded in Volume 87 at Page 471.

g.　Easement Deed to VGS dated October 16, 1985 and recorded in Volume 93 at Page 384.

h.　Easement Deed to CVPS/NET&T dated May 25, 1988 and recorded in Volume 112 at Page 324.

i.　Quitclaim Deed to Cynosure dated June 7, 1996 and recorded in Volume 164 at Page 677.

j.　Easement Deed to CVPS and NET&T dated May 5, 1965 and recorded in Volume 37 at Page 64.

k.　Slope Rights conveyed to the State of Vermont dated August 28, 1975 and recorded in Volume 55 at Page 323.

l.     Easement Deed to VGS dated September 29, 1965 and recorded in Volume 37 at Page 525.

m.    Easement Deed to NET&T, Co. dated February 3, 1972 and recorded in Volume 46 at Page 238.

n.    Easement Deed to CVPS dated May 26, 1975 and recorded in Volume 55 at Page 174.

o.    Water Rights and Easement to John R. Campbell and Ardelle G. Campbell recorded in Volume 60 at Page 262.

p.    Permit for Guy Locations to CVPS/NET&T dated February 22, 1980 and recorded in Volume 79 at Page 598.

q.    Warranty Deed to CVPS dated November 19, 1953 and recorded in Volume 33 at Page 223.

r.    Easement Deed to CVPS dated May 2, 1988 and recorded in Volume 111, Page 339.

s.    Permit for Guy Locations to CVPS dated April 11, 1961 and recorded in Volume 35 at Page 414.

t.    Easement Deed to CVPS dated October 2, 1972 and recorded in Volume 47 at Page 104.

u.    Easement Deed to CVPS/NET&T, Co. dated April 24, 1972 and recorded in Volume 55 at Page 202.

v.    Easement Deed to CVPS dated October 2, 1962 and recorded in Volume 36 at Page 124

w.    Easement to CVPS dated November 18, 1953 and recorded in Volume 33 at Page 221.

x.    Protective Covenants for Catamount Industrial Park dated June 13, 1984 and recorded in Volume 85 at Page 292.

y.    First Amendment to Covenants for Catamount Industrial Park dated June 29, 1999 and recorded in Volume 203 at Page 144.

z.    Declaration of Covenants, Easements, Restrictions and Liens Related to Stormwater Discharge for Catamount Industrial Park Stormwater Associates dated November 21, 2006 and recorded in Volume 342 at Page 600.

aa.   Bylaws of Catamount Industrial Park Stormwater Association, Inc. dated November 15, 2006 and recorded in Volume 342 at Page 634.

bb.   Applicable terms and conditions of State of Vermont Wastewater System and Potable Water Supply Permit # WW-4-3718 dated August 24, 2011, recorded in Volume 408 at Page 312, and the applicable terms and conditions of any and all amendments thereto.

cc.   Applicable terms and conditions of State of Vermont Land Use Permit 4C0550-19 dated September 15, 2011, recorded in Volume 408 at Page 236, recorded in the Land Records.

dd.   Memorandum of Municipal Action dated August 11, 2011 and recorded in Volume 407, Page 126 of the Land Records for site plan approval and boundary line adjustment on Lots 1 & 2.

ee.   Authorization to Discharge pursuant to General Permit 3-9015, Project ID # EJ97-0348 dated August 15, 2011, recorded in Volume ___ Page ___ of the Land Records.

EXHIBIT D

Gardener's Supply
Milton, VT

Landlords Work

1. All necessary or required permits.

2. All general conditions i.e.; trash, traffic control, temporary utilities, insurance, and supervision.

3. All consulting fees for Landlords Scope of Work.

4. Site work of every kind; excavation, backfill, rough and final grading, sidewalks, curb cuts, stormwater ponds, sanitary sewer, water, landscaping and paving.

5. Concrete foundations and concrete slabs per drawings prepared by Sharp Point Engineering.

6. Complete structural framing system including mezzanine, B-deck, R-30 membrane roof, windows, overhead doors, levelers, seals and restraints.

7. All electrical work including, 800 amp, 480 volt main disconnect, distribution panels, step down transformer to 120/208 three phase power, all hi-efficiency light fixtures, building HVAC hookup. Provisions for owner equipment wiring to be performed by others.

8. Warehouse heating will be with suspended unit heaters, office area to have three (3) roof mounted HVAC units, gas piping, and insulated ductwork.

9. A complete plumbing system with all fixtures shown on plan. All ADA handicap accessories.

10. All offices to be constructed with 20 gauge metal studs, 5/8 F.C. sheetrock, taped and painted colors selected by Tenant.

11. Ceilings in offices to be 2 x 4 grid with Armstrong or equal tile.

12. All offices to have carpet or vinyl tile.

13. Building to be equipped with a complete fire alarm and sprinkler system.

**Page 2**

14. Work depicted on following plans all dated 12/5/11:

    A-1    First Floor Plan
    A-2    Mezzanine Floor Plan and Enlarged First Floor Office Plan
    A-3    Exterior Elevations
    A-4    Interior Elevations
    A-5    First Floor and Mezzanine Reflected Ceiling Plan
           Kitchen Sinks Sketch
15. Plans A-1 through A-5 incorporated in Lease as Exhibit D-1
           and Kitchen SinksSSketch

Work by Tenant

A.) All moving or purchasing of production equipment, including wiring of motorized equipment from breakers provided by Landlord.

B.) Tenant to furnish and install all window treatment.

C.) Tenant to provide and install all toilet room accessories such as; soap dispensers, toilet paper holders, paper towel dispensers and waste baskets.



Building spec
correct

Beacon equipment
layout not
correct
CT

EXHIBIT D-1

THE MILLER REALTY GROUP, LLP
5399 Avenue D
Williston, VT 05495
(802) 864-5830

GARDNER KILCOYNE architects
Champlain Mill
20 Winooski Falls Way #24
Winooski, Vermont 05404
Phone 802.655.0145
Fax 802.655.7083
www.gkarchitects.com

MEZZANINE FLOOR PLAN & ENLARGED FIRST FLOOR PLAN
GARDENERS SUPPLY • CATAMOUNT INDUSTRIAL PARK
CONTEAU ROAD ( U.S. ROUTE 7, MILTON, VT

A-2



EXHIBIT D-1



EXHIBIT D-1

EXHIBIT D-1



8'-0" HIGH PARTITION

1/2"

-0" 2'-4"

12'-4"

14'-0"

5'-8 1/4"

2'-2"

3"

K'ETTE

SERVING COUNTER

PLUMBED WATER COOLER

EXHIBIT D-1

EXHIBIT E





Exhibit "F"
Gardener's Supply 2.4 Payout

| Month | Beacon | AGR | Monthly Total |
|-------|--------|-----|---------------|
| May-11 | | $5,200.00 | $5,200.00 |
| Jun-11 | $5,200.00 | - | $5,200.00 |
| Nov-11 | $317,000.00 | | $317,000.00 |
| Dec-11 | | | |
| Jan-12 | | $211,333.00 | $211,333.00 |
| Feb-12 | | $211,333.00 | $211,333.00 |
| Mar-12 | | $211,333.00 | $211,333.00 |
| Apr-12 | | $211,333.00 | $211,333.00 |
| May-12 | | $311,333.00 | $311,333.00 |
| Jun-12 | | $311,333.00 | $311,333.00 |
| Jul-12 | | $200,000.00 | $200,000.00 |
| Aug-12 | | $200,000.00 | $200,000.00 |
| Sep-12 | | $204,602.00 | $204,602.00 |
| Total | $322,200.00 | $2,077,800.00 | $2,400,000.00 |

EXHIBIT G

Permit Number        3318-9015.2
Project ID Number    EJ97-0348

## VERMONT DEPARTMENT OF ENVIRONMENTAL CONSERVATION
### AUTHORIZATION TO DISCHARGE UNDER
### GENERAL PERMIT 3-9015

A determination has been made that the applicant:

The Miller Realty Group, LLP
599 Avenue D
Williston, VT 05495
(Impervious area: 6.47 acres)

meets the criteria necessary for inclusion under General Permit 3- 9015. Hereinafter the
named applicant shall be referred to as the permittee. Subject to the conditions of
General Permit No. 3-9015, the permittee is authorized to discharge stormwater from
Lots 1 & 2 of the Catamount Industrial Park located on US Route 7 and Gonyeau Road in
Milton, Vermont to a tributary of Allen Brook.

*Manner of Discharge:*
*S/N 001:*

*POI#1: Stormwater runoff from parking areas, loading areas and access drive
conveyed via catch basin and closed drainage, and via swale, to a pocket pond
with pre-treatment sediment forebay, discharging via controlled outlet structure
to a tributary of Allen Brook. Additional stormwater runoff from access drive
disconnected in accordance with the Disconnection of Non-Rooftop Runoff
Credit.*

*POI#2: Stormwater runoff from building rooftop piped directly to a pocket pond,
discharging via controlled outlet structure to a tributary of Allen Brook.*

*Design:* This project shall be constructed and operated in accordance with the site
plans and details designed by Lamoureux & Dickinson Consulting Engineers, Inc.
(Sheet 1, 2, 3, 4, 5, and ST, all dated 6-20-11; and all supporting information).

By reference, the above noted plans are made part of this authorization.

<u>Compliance with General Permit 3-9015 and this Authorization</u>
The permittee shall comply with this authorization and all the terms and conditions of
General Permit 3-9015, including the payment of annual operating fees to the
Department. A billing statement for such fees will be sent to the permittee each year. The
first year's statement is enclosed. Any permit non-compliance, including a failure to pay
the annual operating fee, constitutes a violation of 10 V.S.A. Chapter 47 and may be
grounds for an enforcement action or revocation of this authorization to discharge.

## Transferability

This authorization to discharge is not transferable to any person except in compliance with Part VI.D. of General Permit 3-9015. A copy of General Permit 3-9015 is available from the Department via the internet at
http://www.anr.state.vt.us/dec/waterq/stormwater/docs/sw_3-9015-finalpermit.pdf

## Changes to Permitted Development

In accordance with Part V.G. of General Permit 3-9015, the permittee shall notify the Department of any planned development or facility expansions or changes that may result in new or increased stormwater discharges. The Department shall determine the appropriateness of continued inclusion under General Permit 3-9015 by the modified development or facility.

## Semi-Annual Inspection and Report

The stormwater collection, treatment and control system authorized herein shall be properly operated and maintained and shall be inspected at least twice per year, once in the spring after snowmelt and once in the fall prior to snow fall. The inspection shall evaluate the operation and maintenance and condition of the stormwater collection, treatment and control system. The permittee shall prepare a semiannual inspection report on a form available from the Department. The permittee shall, by November 1st and June 1st of each year, submit an inspection report to the Department.

## Restatement of Compliance

An initial statement of compliance, signed by a designer, must be submitted to the Department no later than 6 months following completion of construction of the stormwater management system. Then, every 3 years, the permittee shall submit to the Department a written statement signed by a designer that the stormwater collection, treatment and control system authorized herein is properly operating and maintained. The first re-statement of compliance is due August 15, 2014. Failure to submit a designer's restatement of compliance shall constitute a violation of General Permit 3-9015 and may result in the revocation of this authorization to discharge.

## Recording in Land Use Records:

The permittee shall record a one-page notice of issuance of this discharge permit in the local land records within fourteen (14) days of issuance of this authorization to discharge on the form provided by the Secretary, per §18-312 of Stormwater Management Rule. The permittee shall provide a copy of the recording to the Secretary within fourteen (14) days of the permittee's receipt of the copy of the recording from the local land records.

## Rights to Appeal to the Environmental Court

Pursuant to 10 V.S.A. Chapter 220, any appeal of this decision must be filed with the clerk of the Environmental Court within 30 days of the date of the decision. The appellant must attach to the Notice of Appeal the entry fee of $250.00, payable to the state of Vermont. The Notice of Appeal must specify the parties taking the appeal and the statutory provision under which each party claims party status; must designate the act or decision appealed from; must name the Environmental Court; and must be signed by the appellant or their attorney. In addition, the appeal must give the address or location and description of the property, project or facility with which the appeal is concerned and

the name of the applicant or any permit involved in the appeal. The appellant must also serve a copy of the Notice of Appeal in accordance with Rule 5(b)(4)(B) of the Vermont Rules for Environmental Court Proceedings. For further information, see the Vermont Rules for Environmental Court Proceedings, available on line at www.vermontjudiciary.org. The address for the Environmental Court is 2418 Airport Road, Suite 1, Barre, VT 05641 (Telephone #802-828-1660).

Effective Date and Expiration Date of this Authorization
This authorization to discharge shall become effective on August 15, 2011 and shall continue until August 15, 2021. The permittee shall reapply for coverage at least sixty (60) days prior to August 15, 2021.

Dated at Waterbury, VT this 15th day of August, 2011.

David K. Mears, Commissioner
Department of Environmental Conservation

By _____
     Padraic Monks, Stormwater Program Manager
     Stormwater Management Program

EXHIBIT H

## TERMINATION OF LEASE
## AND AGREEMENT REGARDING REMOVAL OF EQUIPMENT

**THIS AGREEMENT**, made as of the ___ day of December, 2011, by and between **THE MILLER REALTY GROUP, LLP**, a Vermont limited liability partnership with its principal place of business at 599 Avenue D in Williston, County of Chittenden and State of Vermont ("Landlord") and **AMERICA'S GARDENING RESOURCES, INC.**, a Delaware corporation with a place of business at 128 Intervale Road in Burlington, County of Chittenden and State of Vermont ("Tenant"), (hereinafter the Landlord and Tenant are sometimes collectively called the "Parties").

## W I T N E S S E T H :

**WHEREAS,** on or about September 27, 2005, Landlord and Tenant executed a Lease Agreement (the "Essex Lease"), under the terms and provisions of which Landlord was to lease to Tenant and Tenant was to lease from Landlord, certain lands and premises known as 5 New England Drive, Essex, Vermont (the "Essex Premises") for a term of five (5) years, with two (2) five-year options to renew, unless sooner terminated or extended as provided therein; and

**WHEREAS,** as of the date hereof, Landlord and Tenant have entered into a new Lease Agreement (the "New Lease"), under the terms and provisions of which Landlord is to lease to Tenant and Tenant is to lease from Landlord, certain lands and premises known as Lots 1 and 2, Catamount Industrial Park, Milton, Vermont (the "Milton Premises"); and

**WHEREAS,** the Landlord and Tenant hereto desire to terminate and cancel the Essex Lease as of the Rent Commencement Date (as defined in the New Lease), and to release each other from their respective obligations to perform, keep, and observe the conditions, covenants and agreements contained in the Essex Lease; and

**WHEREAS,** the Tenant has arranged for The Beacon Group, Inc., a Massachusetts corporation with a place of business in Tewksbury, Massachusetts ("Beacon"), to remove equipment from the Essex Premises that Tenant will not be using in the Milton Premises (the "Equipment"); and

**WHEREAS,** Landlord agrees that upon receiving evidence that either Tenant or Beacon has adequate general liability and property damage insurance for the Essex Premises during the Equipment Removal Period, Beacon will have up to thirty (30) days from the Rent Commencement Date to remove the Equipment from the Essex Premises (the "Equipment Removal Period") at Tenant's sole cost and expense; and

**WHEREAS,** Landlord and Tenant agree that any Equipment remaining on the Essex Premises after the expiration of the Equipment Removal Period will be removed by Landlord and disposed of at its discretion, at Tenant's sole cost and expense, which cost and expense will be added to the amount due and payable by Tenant under the New Lease; and

WHEREAS, Tenant represents that at the end of the Equipment Removal Period, the Essex Premises will be broom clean and Tenant agrees to hold Landlord harmless from any and all damages, loss, cost and expense incurred by Landlord on account of Beacon's removal of the Equipment.

NOW, THEREFORE, it is hereby mutually agreed by and between the Landlord and Tenant hereto as follows:

1. That the Essex Lease shall be terminated and canceled and the term thereof brought to an end as of the Rent Commencement Date (as defined in the New Lease), with the same force and effect as if the term of the Essex Lease was, by the terms and provisions thereof, fixed to expire on the Rent Commencement Date.

2. As of the Rent Commencement Date, Landlord and Tenant shall be respectively released and discharged from their respective obligations to perform, keep and observe the agreements, covenants and conditions in the Essex Lease on their respective parts to be performed, kept and observed, except as otherwise meant to survive under terms of the Lease.

3. Prior to first entry by Beacon, Tenant shall provide Landlord with evidence that Tenant has general liability and property damage insurance for the Essex Premises during the Equipment Removal Period. After the Rent Commencement Date and upon Landlord's receipt of said evidence of insurance, Tenant and Beacon will have limited access to the Essex Premises for the sole purpose of removing the Equipment, which removal will be at Tenant's sole cost and expense. Landlord and Tenant agree that any Equipment remaining on the Essex Premises after the Equipment Removal Period shall be removed by Landlord and disposed of at its discretion, at Tenant's sole cost and expense, which cost and expense will be paid by Tenant to Landlord with the first monthly Base Rent payment under the New Lease.

4. Tenant represents that the Essex Premises will be broom clean and in good condition at the end of the Equipment Removal Period and Tenant unconditionally and irrevocably indemnifies and agrees to defend and hold harmless Landlord and its officers, employees, agents, contractors and those claiming by, through or under Landlord, from and against all damages, loss, cost and expense (including attorneys' fees) of whatever nature suffered or incurred by Landlord on account of Beacon's removal of the Equipment during the Equipment Removal Period.

Each and all of the conditions, covenants and agreements herein contained shall be binding on and inure to the benefit of the parties hereto, and their respective heirs, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Termination of Lease and Agreement as of the date first above mentioned to be effective as of the Rent Commencement Date.

IN PRESENCE OF:                THE MILLER REALTY GROUP, LLP

_Louise M. Bashaw_
Witness                    Duly Authorized Agent

IN PRESENCE OF:                AMERICA'S GARDENING RESOURCES, INC.

_Ellen Desjardin_
Witness                    Duly Authorized Agent

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

    At _Williston_ in said County and State, this _6th_ day of December, 2011, personally appeared _Robert E. Miller   Agent_ , ~~Partner~~ and duly authorized agent of THE MILLER REALTY GROUP, LLP and he acknowledged this instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of THE MILLER REALTY GROUP, LLP.

                Before me, _Louise M. Bashaw_
                        Notary Public
              My commission expires: 02/10/15

STATE OF VERMONT
CHITTENDEN COUNTY, SS.:

    At _Burlington, VT_ in said County and State, this _9_ day of December, 2011, personally appeared _Cindy Jureot_ , duly authorized agent of AMERICA'S GARDENING RESOURCES, INC. and he/she acknowledged this instrument, by him/her sealed and subscribed, to be his/her free act and deed and the free act and deed of AMERICA'S GARDENING RESOURCES, INC.

                Before me, _Ellen Desjardin_
                        Notary Public
                My commission expires: 02/10/15